### BELL ATLANTIC–MARYLAND, INC.

v.

### PRINCE GEORGE'S COUNTY, MARYLAND.

No. Civ. CCB–98–4187.

United States District Court,
D. Maryland.

May 24, 1999.

James P. Garland, Matthew Sturtz, Miles & Stockbrige, Baltimore, MD, for plaintiff.

Sean Wallace, Upper Marlboro, MD, Nicholas P. Miller, William Malone, Miller & Van Eaton, PLLC, Washington, DC, for defendant.

## MEMORANDUM

BLAKE, District Judge.

Now pending before the court is the motion to dismiss filed by the defendant, Prince George's County, Maryland ("the County"). In the complaint, the plaintiff, Bell Atlantic–Maryland, Inc. ("Bell Atlantic"), challenges the legality of Prince George's County ordinance CB–98–1998, known as the "Telecommunications Franchise Law" ("the ordinance"). The ordinance establishes a comprehensive "franchise" scheme regulating the use of the County's public rights-of-way by telecommunications companies seeking to do business in Prince George's County. Bell Atlantic attacks the ordinance on a variety of federal and state statutory and constitutional grounds. Since the parties have agreed that this matter is to be decided in its entirety on the present motion, Bell Atlantic's opposition to the County's motion will be treated as a counter-motion for judgment on the pleadings. *See* Fed. R.Civ.P. 12(c).

For the reasons that follow, the court will grant Bell Atlantic's motion and issue an injunction permanently enjoining the County from enforcing the ordinance. Bell Atlantic's request for damages, attorneys' fees, and costs will be denied.

## BACKGROUND

Bell Atlantic is a Maryland corporation that provides telephone services to individuals, businesses, and governments in Prince George's County and throughout Maryland. As the incumbent local exchange carrier for Prince George's County, Bell Atlantic has constructed and continues to construct a network of telephone lines and related facilities needed to provide telephone services in the county. These lines and facilities use the County's public rights-of-way. *See* Compl. ¶¶ 2, 5, 18. Prince George's County is a Maryland home-rule county, having adopted a charter form of government in 1970. Compl. ¶ 3. As a home-rule county, Prince George's County has been authorized by the state legislature to exercise all of the powers set forth in Article 25A, section 5, of the Annotated Code of Maryland of 1957.

### I. The Ordinance [1]

In the fall of 1998, the county council passed and the county executive signed

1. Since this case involves a challenge to Prince George's County's telecommunications

into law Prince George's County ordinance CB–98–1998, entitled "An Act concerning Telecommunications Franchises for the Use of Public Property and Public Rights-of-way in the County." The ordinance declares that no person shall

> construct, operate, replace, reconstruct or maintain a telecommunications system on, over, or under any public rights-of-way in . . . the County without a franchise granted by the County to provide telecommunications services within the County.

Sec. 5A–151(a). The County's "franchise" requirement applies equally to telephone services providers, like Bell Atlantic, which own and operate their own telephone lines and facilities,[2] as well as to telecommunications companies which provide services through lines and facilities owned and maintained by others.[3] Furthermore, the franchise requirement covers both existing lines and facilities and future lines and facilities.[4] Failure to obtain a franchise before using the County's public rights-of-way may subject a telecommunications company to "the immediate revocation of any existing permits, licenses or franchises issued by the County. . . ." Sec. 5A–159(c). In addition, the County "may order prompt removal" of the company's existing lines and facilities "at the [company's] expense." *Id.*

In order to obtain a franchise from the County, the ordinance requires a telecommunications company to complete an application form providing the following information:

> (1) The name, address, telephone and facsimile number of the applicant;

(2) The name, address and telephone number of a responsible person whom the County may notify or contact at any time concerning the applicant's telecommunications system;

(3) An engineering site plan showing the proposed location of the telecommunications system, including any manholes or overhead poles, the size, type and proposed depth of any conduit or other enclosures, the relationship of the system to all existing poles, utilities, sidewalks and other improvements within the public rights-of-way, and the facility or public property address;

(4) The technical standards that the applicant proposes to follow in construction and operation of the telecommunications system; ·

(5) A description of the telecommunications services to be provided;

(6) The period of time the applicant intends to use the public property or rights-of-way;

(7) Financial information;

(8) A list of other jurisdictions in which the applicant operates or has operated a telecommunications system; and

(9) Any additional information the County's application form may require.

Sec. 5A–152(a)(1)–(9). There also is a $5,000 application fee. Sec. 5A–152(b).

Completed applications that "meet[ ] all the requirements of the Division" then undergo a public hearing. Sec. 5A–152(d). At the hearing, oral and written testimony and "any other relevant material" may be

---

franchise law, the relevant provisions of the law will be described in detail. For the complete text of the law, *see* Compl., Ex. 6.

**2.** *See* Sec. 5A–151(b) ("A person shall obtain a franchise, subject to the provisions of this Division[,] for any telecommunications system that occupies one or more portions of public property and/or the public rights-of-way").

**3.** *See* Sec. 5A–151(e) ("No person shall provide a telecommunications service through facilities owned, maintained or operated by

any party upon, across, beneath, or over any public right-of-way in the County without obtaining a franchise therefor pursuant to the provisions of this Division").

**4.** *See* Sec. 5A–159(a) ("The provisions of this Division shall apply to all telecommunications transmission systems either installed or under construction within the County as of the effective date of this Division or thereafter installed or constructed").

presented for and against the application. *Id.* The ordinance provides that, in evaluating a franchise application, "the County may consider" the following factors:

(1) The applicant's managerial, technical, financial and legal qualifications to construct and operate a telecommunications system on County property;

(2) The nature of the proposed facilities, equipment, and services;

(3) The applicant's recent performance record of using public rights-of-way in providing telecommunications services in other communities, if any;

(4) Whether the proposal will serve and protect the public interest;

(5) The effects of a grant of a franchise on the use of the public rights-of-way, including consideration of the effect on current authorized users of the rights-of-way; and

(6) Such other factors as the County may deem relevant.

Sec. 5A–152(e)(1)–(6). Based on these factors, the County recommends either that a franchise be granted or that the application be denied. Sec. 5A–152(f).[5] Even if the County recommends that a franchise be granted, however, this is not the end of the process. The next step is for the applicant and the county executive to negotiate a "franchise agreement." Sec. 5A–152(g).

A franchise agreement sets forth the terms and conditions of a telecommunications company's authorization (i.e., its "franchise") to use the County's public rights-of-way.[6] It is not meant to replace any existing rules and regulations governing the use of the County's roads and property, which remain in effect.[7] A franchise agreement must be agreed upon by the parties "within ninety (90) days from the notice of the proposed grant," otherwise "the notice of proposed grant shall become void" and the process starts over. Sec. 5A–152(g).[8] Once agreed upon by the county executive, however, a franchise agreement remains subject to the final approval of the county council. Sec. 5A–152(h).[9] Until a franchise agreement between the County and the applicant has been executed and approved, any franchise granted by the County to a telecommunications company "shall not become effective." Sec. 5A–153(a).[10] The maximum term of a franchise agreement is 15 years, subject to renewal by the County "in its sole discretion." Sec. 5A–153(a), (f). Telecommunications companies whose franchises are not renewed by the County may be required by the County to remove their existing lines and facilities at their own expense. *See* Sec. 5A–158(e).

Each executed and approved franchise agreement must include the following terms and conditions:

(1) Insurance, bond and indemnification requirements;

---

5. The ordinance does not specify which County decisionmaker will preside over the hearing or make this initial recommendation. Instead, the ordinance delegates to the county executive the authority "to adopt regulations that are consistent with this Division to administer and implement this Division." Sec. 5A–166(b).

6. *See* Sec. 5A–153(b) ("A franchise authorizes use of the public rights-of-way and those portions of public property specifically designated in the franchise agreement . . .").

7. *See* Sec. 5A–153(g) ("The provisions governing any and all other permits that may be required by the County shall still apply and all other applicable fees are still due").

8. This period may be extended by the county executive for an additional 90 days "for good cause." Sec. 5A–152(g).

9. The ordinance requires that the county council register its approval of a franchise agreement "by resolution." Sec. 5A–152(i).

10. In addition, the ordinance requires the applicant to pay a "franchise acceptance fee in an amount not to exceed the County's costs in considering the application, less the amount of the filing fee," within 30 days of the date the grant of the franchise is approved by the county council, otherwise "the grant shall become void." Sec. 5A–152(j).

(2) Requirements and conditions for construction in and use of the rights-of-way;

(3) A description of the type and location of the system facilities to be placed on public property or within the public rights-of-way;

(4) Reporting and record-keeping requirements, including financial audits and reconciliation of right-of-way charge payments; [and]

(5) Any other provision or requirement deemed necessary by the County. Sec. 5A–153(d). In addition, the County expressly reserves the right, "to the extent permitted by law, to require a franchisee, as part of a franchise agreement, to provide telecommunications services, facilities, equipment and/or capacity for use to the County, at no charge to the County." Sec. 5A–154(d). Moreover, where the County deems it necessary, "for public purposes, to utilize the public property and/or rights-of-way that are occupied by a franchisee," the ordinance authorizes the County to require the franchisee, at its expense, to "remove any facilities and equipment within sixty (60) days ... and restore the public property or rights-of-way to its original condition or to such comparable condition as may be requested by the County." Sec. 5A–153(c).

Along with regulating which telecommunications companies may use the County's public rights-of-way and on what terms, the County's telecommunications franchise law also imposes a 3% "right-of-way charge" on all franchisees "for the privilege of using the public property and/or public rights-of-way." Sec. 5A–154(a). This 3% charge is levied on each franchisee's annual gross revenues. The ordinance defines "gross revenues," in pertinent part, as

all revenues derived directly or indirectly by the franchisee, its affiliates, subsidiaries, parent companies and any person

in or with whom the franchisee has a financial interest, or revenues received by the franchisee from a person with whom the franchisee has a revenue-producing agreement, from the operation of the Telecommunications System in the designated franchise area....

Sec. 5A–150(a)(9).[11] More specifically, the ordinance explains that gross revenues "shall include, but not be limited to:"

(A) All gross revenues from local telecommunications services billed to a County address or account number or originating within the unincorporated area of the County;

(B) All gross revenues from long distance telecommunications services billed to a County address or account number or originating within the unincorporated area of the County;

(C) All gross revenues from telecommunications services levied on a usage or usage sensitive, mileage or flat rate basis;

(D) All gross revenues collected from connection or disconnection fees;

(E) All gross revenues from penalties or charges to customers for checks returned from banks, net of bank costs paid; all gross revenues from recoveries of bad debts previously written off, and revenues from sales of assignments of bad debts. Unrecovered bad debts charged off after diligent, unsuccessful efforts to collect may be excluded from gross revenue computations;

(F) All gross revenues from the rental, lease or sublease of any conduit space, or any portion of the franchisee's telecommunications system, or any capacity to other persons, whether or not owned in whole or part by the franchisee, for the provision of telecommunications services, including, but not limited to, all gross revenue from local access fee charges;

11. Gross revenues received from a franchisee's provision of universal telephone services in the county, pursuant to 47 U.S.C. § 254(c)(1), are exempt from this charge. Sec. 5A–154(c).

(G) All other gross revenues from the provision of telecommunications services provided by the franchisee within the County;

. . .

(J) All gross revenues collected as a line item or otherwise passed through to the consumer, including, but not limited to, right-of-way charges.

Sec. 5A–150(a)(9)(A)–(G).

Under the ordinance, franchisees are required to pay their right-of-way fees on a quarterly basis, and must accompany their payments with a financial statement "showing the franchisee's gross revenues for the quarter in question." Sec. 5A–154(e). They are also required to file with the County annual financial statements that have been audited by a certified public accountant. Sec. 5A–154(g). The County expressly reserves the right "to audit and to recompute any amounts determined to be payable under this Division." Sec. 5A–154(h). Furthermore, the ordinance prohibits franchisees from "separately identify[ing] the right-of-way charge on customer invoices or charg[ing] a surcharge to customers within the County unless similar charges for all other facilities rented by the person to provide telecommunications services are similarly identified or charged." Sec. 5A–154(k).

A franchisee's failure to comply with any of the provisions of the ordinance or any of the terms or conditions of its franchise agreement may lead to the revocation of its franchise by the County. Sec. 5A–158(a). If the County revokes a franchise, "the County may request the franchisee at the franchisee's or surety's expense to remove its facilities and equipment within sixty (60) days of the request and restore the public property and rights-of-way to

the County's specifications." Sec. 5A–158(e).

Finally, the ordinance prohibits the "transfer of a franchise, or a transfer of an interest in or control of a franchisee or a franchise . . . without prior application to and approval by the County." Sec. 5A–156(a).[12] The ordinance defines the "transfer of a franchise" as "any transaction in which:"

(A) An ownership or other interest in or control of a franchisee or its telecommunications system is transferred, directly or indirectly, from one person or group of persons to another person or group of persons so that actual working control of the franchisee's telecommunications system is transferred; or

(B) The rights held by the franchisee under a franchise agreement are transferred or assigned to another person or group of persons.

Sec. 5A–150(a)(19)(A)–(B). The ordinance defines the "transfer of an interest in a franchisee" as

the sale or transfer, directly or indirectly, of an existing or newly created equity interest in the franchisee that may or may not result in a transfer of control of the franchisee.

Sec. 5A–150(a)(20). Thus, the ordinance imposes restrictions not only on the transferability of franchises granted by the County, but also on the transferability of shares of stock in franchisees doing business in Prince George's County.[13]

The effective date of the ordinance, which includes a severability clause, was January 4, 1999. Compl. ¶ 17.

## II. Bell Atlantic's Lawsuit

Bell Atlantic instituted the present lawsuit on December 23, 1998. In its complaint, Bell Atlantic asserts that the County's telecommunications franchise

---

**12.** This prohibition does not apply to "a transfer of an interest to a person who already holds an ownership interest of 25 percent or more . . . if transfer of a franchise does not occur." Sec. 5A–156(a).

**13.** *See* Sec. 5A–156(d) ("Before approving a transfer of an interest in a franchisee, the County may consider without limitation whether the transferee's interest will have any effect on the franchisee's operation of the system, the franchisee's qualifications, or the public interest").

law violates numerous provisions of federal and state law, including the Contracts, Commerce, and Due Process Clauses of the United States Constitution;[14] 42 U.S.C. § 1983;[15] the Federal Telecommunications Act of 1996;[16] the Maryland Declaration of Rights;[17] the Maryland Public Utility Companies Article;[18] and Maryland common law (breach of contract).[19] Bell Atlantic seeks declaratory and injunctive relief, as well as damages, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

On the same day that it filed its complaint, Bell Atlantic also filed a motion for a preliminary injunction. This motion was rendered moot following a hearing held before Chief Judge J. Frederick Motz on January 6, 1999.[20] At the hearing, the parties agreed to maintain the *status quo ante* pending the outcome of this case. Subsequently, the County filed its present motion to dismiss, and Bell Atlantic filed its response. Amicus briefs were filed in support of Bell Atlantic's position by Sprint Communications Company, L.P., and AT & T Communications of Maryland, Inc., both of which have filed their own lawsuits against the County seeking to overturn the telecommunications franchise law.[21] A hearing on the present motion was held before this court on April 16, 1999. Counsel for all parties, including Sprint and AT & T, were present and addressed the court on the matters now pending.

### STANDARD OF REVIEW

The standard for dismissing a complaint for failure to state a claim upon which relief can be granted is a high one. "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.1992). Consequently, the County's motion to dismiss under Rule 12(b)(6) may not be granted unless, viewing the complaint in the light most favorable to Bell Atlantic and accepting Bell Atlantic's factual allegations, as well as all reasonable inferences therefrom, as true, "it appears beyond doubt that [Bell Atlantic] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.*

The standard for granting judgment on the pleadings under Rule 12(c) is similar to the standard for granting summary judgment under Rule 56(c): whether, "when viewed in the light most favorable to the party against whom the motion is made [here, the County], no genuine issues of material fact remain and the case can be decided as a matter of law." *King v. Gemini Food Servs., Inc.*, 438 F.Supp. 964, 966 (E.D.Va.1976), *aff'd*, 562 F.2d 297 (4th Cir.1977); *see also Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir.1988) ("Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law") (internal quotation marks and citation omitted). Because the parties do not

---

14. U.S. Const. art. I, § 10; U.S. Const. art. I, § 8; U.S. Const. amend. XIV, § 1, respectively; *see* Compl. ¶¶ 23, 28, 35.

15. *See* Compl. § 53.

16. 47 U.S.C. § 251 *et seq.; see* Compl. ¶ 62. Bell Atlantic also asserts that the law violates the Federal Communications Act of 1934, 47 U.S.C. § 151 *et seq. See id.*

17. *See* Compl. ¶¶ 75, 80.

18. *See* Compl. ¶ 89.

19. *See* Compl. ¶ 67.

20. This case was reassigned to Judge Catherine C. Blake on February 26, 1999.

21. *See Sprint Communications Co. v. Prince George's County*, CCB–99–288, filed February 3, 1999; *AT & T Communications, Inc. v. Prince George's County*, CCB–99–465, filed February 18, 1999. These cases have also been assigned to Judge Blake.

disagree about any material facts involved in this case and the outcome depends upon pure questions of law, judgment on the pleadings is appropriate.

## ANALYSIS

■■■ In keeping with the court's "duty to avoid deciding constitutional questions presented unless essential to a proper disposition of a case," *Harmon v. Brucker*, 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958), the court turns first to Bell Atlantic's claim that the County's telecommunications franchise law violates the Federal Telecommunications Act of 1996 ("FTA"). *See* Compl. ¶¶ 54–62 (Count V). It is a "familiar and well-established principle" that the Supremacy Clause, U.S. Const. art. VI, cl. 2, invalidates all state and local laws that "interfere with, or are contrary to," federal law. *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (citation omitted). Local laws may be invalidated under the Supremacy Clause in several different ways. *Id.* at 713, 105 S.Ct. 2371. Relevant for purposes of this case, a local law "is nullified to the extent that it actually conflicts with federal law" by "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations omitted). After much careful consideration, the court finds that Prince George's County ordinance CB–98–1998 fatally conflicts with the terms and goals of the FTA.

### I. The Federal Telecommunications Act of 1996

Congress passed the FTA in 1996 in order "to end the monopolies in local telephone services and to benefit consumers by fostering competition between telephone companies in cities throughout the United States." *AT&T Communications, Inc. v. City of Dallas*, 8 F.Supp.2d 582, 585 (N.D.Tex.1998). It was Congress's intention that market competition, rather than state or local regulations, would primarily determine which companies would provide the telecommunications services demanded by consumers. *See In re Classic Tel., Inc.*, 11 F.C.C.R. 13082, ¶ 25 (F.C.C.1996). To carry out this goal, Congress adopted sweeping restrictions on the authority of state and local governments to limit the ability of telecommunications companies to do business in local markets. *See AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, ——, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999) ("States may no longer enforce laws that impede competition"); *City of Dallas*, 8 F.Supp.2d at 591 ("Congress's intent was to remove all barriers to entry in the provision of telecommunications services by preempting all state and local legal requirements that directly or indirectly prohibit market entry").

The provision of the FTA at issue here, 47 U.S.C. § 253, entitled "Removal of barriers to entry," provides, in relevant part:

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory ba-

sis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(a)–(c).

■ Section 253 preempts all state and local regulations that "prohibit or have the effect of prohibiting" any company's ability to provide telecommunications services, *see id.* § 253(a), unless such regulations fall within either of the statute's two "safe harbor" provisions, *see id.* § 253(b), (c). Section 253(b) permits states to adopt "competitively neutral" regulations "necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." This provision only applies to states, however, "unless of course a state specifically delegated the state authority to its local governments." *BellSouth Telecomms., Inc. v. City of Coral Springs,* 42 F.Supp.2d 1304, 1305 (S.D.Fla.1999); *see also In re Classic Tel.,* 11 F.C.C.R. 13082, ¶ 34. In the absence of such a delegation, local governments are prohibited by the FTA from exercising any regulatory powers over telecommunications companies beyond those listed in section 253(c): "manag[ing] the public rights-of-way" and "requir[ing] fair and reasonable compensation" for the "use" thereof. "Municipalities therefore have a very limited and proscribed role in the regulation of telecommunications." *City of Dallas,* 8 F.Supp.2d at 591.

## II. Does the ordinance violate the FTA?

■ In assessing whether the County's telecommunications franchise law violates the FTA, the first question the court must address is: Does the ordinance "prohibit or have the effect of prohibiting" Bell Atlantic and other telecommunications companies from doing business in Prince George's County? *See* 47 U.S.C. § 253(a). The County's position is that the ordinance "is not a prohibition against entry," but rather "merely implements an optional process for entry." Def.'s Motion, p. 8.

What the County appears to overlook is that the FTA preempts local regulations that not only "prohibit" outright the ability of any entity to provide telecommunications services, but also those that "may ... have the effect of prohibiting" the provision of such services. The court believes that any "process for entry" that imposes burdensome requirements on telecommunications companies and vests significant discretion in local governmental decision-makers to grant or deny permission to use the public rights-of-way "may ... have the effect of prohibiting" the provision of telecommunications services in violation of the FTA.

After reviewing the various provisions of the ordinance being challenged in this case, the court finds that the County's telecommunications franchise law unquestionably has the effect of prohibiting the provision of telecommunications services by Bell Atlantic and other telecommunications companies seeking to do business in Prince George's County. First, the ordinance prohibits any company from using the County's public rights-of-way to provide telecommunications services without first obtaining a "franchise" from the County. *See* Sec. 5A–151. In order to obtain a franchise, telecommunications companies must submit a lengthy and detailed application form, along with a $5,000 application fee. *See* Sec. 5A–152. Completed applications are then subjected to a complex approval process, at each step in which the County exercises complete discretion over whether to grant or deny permission to use the County's public rights-of-way. *See id.* Once a franchise has been granted, the franchisee is required, *inter alia,* to file regular financial reports and to pay a "right-of-way charge" of 3% of its annual gross revenues. *See* Sec. 5A–154. Finally, the ordinance prohibits the sale of shares of stock in a franchisee without the County's prior approval. *See* Sec. 5A–156.[22] While each of

---

**22.** The foregoing description is not intended by the court to be an exhaustive list of the

these requirements, individually, may or may not "have the effect of prohibiting" Bell Atlantic and other companies from providing telecommunications services in Prince George's County, the court believes that, in combination, they create a substantial and unlawful barrier to entry into the Prince George's County telecommunications market.

Having determined that the County's telecommunications franchise law violates section 253(a) of the FTA, the next question is whether it nonetheless falls within the "safe harbor" provision of section 253(c).[23] The County contends that, under 47 U.S.C. § 253(c), the ordinance "is an expressly permitted vehicle for the County's management of, and receipt of compensation for[,] multiple telecommunications providers' uses of the County's rights-of-way." Def.'s Motion, p. 3; *see also id.*, pp. 4, 7, 9. Bell Atlantic, on the other hand, contends that the ordinance "attempts to regulate far beyond the narrow scope of rights-of-way management." Pl.'s Opposition, p. 9; *see also id.*, pp. 5, 6, 8. More specifically, Bell Atlantic argues that the ordinance's various requirements, including the detailed application, the periodic financial reports, and the right-of-way charge, "bear no relationship" to the County's authority under section 253(c) to "manage the public rights-of-ways" and to "require fair and reasonable compensation" for the "use" thereof. *See generally* Pl.'s Opposition, pp. 25–32. Resolving this dispute requires the court to examine the meaning of section 253(c) in greater depth.

Three questions must be addressed in connection with this issue: First, what does it mean "to manage the public rights-of-way"? Second, what is the meaning of "fair and reasonable compensation"? And third, what does it mean to "use" the public rights-of-way?

(i) managing the public rights-of-way

With regards to the first question, this court joins the other district courts which have looked for guidance to the interpretation offered by the Federal Communications Commission ("FCC"), the agency charged with implementing the FTA. *See, e.g., City of Coral Springs,* 42 F.Supp.2d at 1305; *City of Dallas,* 8 F.Supp.2d at 591–92.[24] In *In re TCI Cablevision of Oakland County, Inc.,* 12 F.C.C.R. 21396 (F.C.C. 1997), the FCC explained the meaning of section 253(c) as follows:

[S]ection 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way.... [T]he types of activities that fall within the sphere of appropriate rights-of-way management ... include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of build-

ordinance's provisions that "may ... have the effect of prohibiting" the provision of telecommunications services in Prince George's County.

23. Significantly, the County does not contend that the ordinance is justified as an exercise of the broad regulatory powers reserved to the states, but delegable to local governments, under section 253(b).

24. The County erroneously asserts that the FCC "lacks jurisdiction to construe subsection (c)." Def.'s Reply, p. 10. Pursuant to 47 U.S.C. § 253(d), the FCC is expressly autho-

rized, "after notice and an opportunity for public comment," to preempt any local "legal requirement" that it determines violates section 253(a). Since local governments may be expected to defend their regulations on the grounds that they fall within the "safe harbor" provision of section 253(c), the FCC must have the authority to construe section 253(c) in order to determine whether local regulations violate section 253(a). In any event, while the FCC's interpretation of section 253(c) is informative, the court is not suggesting that it is controlling.

ing codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

*Id.* ¶ 103. These activities were spelled out in somewhat greater detail in *In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082 (F.C.C.1996), in which the FCC quoted from the congressional testimony of Senator Diane Feinstein, who "offered examples of the types of restrictions that Congress intended to permit under section 253(c)." These examples included

—"regulat[ing] the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts"

—"requir[ing] a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies"

—"requir[ing] a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavations"

—"enforc[ing] local zoning regulations" [and]

—"requir[ing] a company to indemnify the City against any claims of injury arising from the company's excavation"

*See id.* ¶ 39 (citation omitted).

■ The County certainly is permitted under the FTA to require telecommunications companies interested in using the County's public rights-of-way to obtain a County-issued franchise. *See City of Coral Springs,* at 1306; *City of Dallas,* 8 F.Supp.2d at 592; *see also Classic Tel.,* 11 F.C.C.R. 13082, ¶ 28 ("We do not believe that Congress intended to remove franchising authority from State and local governments"). The court believes, however, that the terms of any such franchise must be limited to the types of activities de-

scribed by the FCC in *TCI Cablevision* and *Classic Telephone, supra.*[25] Any attempt to regulate telecommunications companies beyond this fairly narrow scope exceeds the County's authority under federal law. Furthermore, the court agrees with the district courts in *BellSouth Telecommunications, Inc. v. City of Coral Springs* and *AT & T Communications of the Southwest, Inc. v. City of Dallas, supra,* that the County's decision to grant or deny a franchise may not be left to the County's ultimate discretion, but rather may only be conditioned on a telecommunications company's agreement to comply with the County's reasonable regulations for managing the use of its rights-of-way. *See City of Coral Springs,* at 1306; *City of Dallas,* 8 F.Supp.2d at 592–93. These various limitations on the County's authority are necessary to give effect to Congress's goal of promoting maximum competition among local telecommunications providers.

■ The court agrees with Bell Atlantic that the County's telecommunications franchise law, when viewed in the light of the above standard, attempts to regulate telecommunications companies in ways that exceed the County's allowable authority "to manage the public rights-of-way" under section 253(c). First, the ordinance requires telecommunications companies to supply information to the County that is not directly related to the County's management of its rights-of-way. For example, the application form requires telecommunications companies to provide undefined "financial information" as well as information about "other jurisdictions" in which the companies operate. Sec. 5A–152(a)(7)–(8). The application form also requires telecommunications companies to provide information about the "technical standards" that the compa-

---

**25.** Bell Atlantic points out that many of these activities already are provided for under the County's "Roads and Sidewalks" ordinance. Pl.'s Opposition, pp. 29–30. Even so, the County is not thereby precluded from imposing an additional "franchise" requirement on telecommunications providers. *See* Md.Ann.

Code. of 1957, Art. 25A, § 5(B) (authorizing charter counties "to grant ... any right or franchise in relation to any highway, street, road, lanes, alley or bridge"). The terms and conditions of any additional franchise requirement, of course, must be consistent with the provisions of the FTA.

nies intend to follow in operating their telecommunications systems and "[a]ny additional information" that the County may request. Sec. 5A–152(a)(4), (9).

Most objectionable is the fact that the ordinance vests the County with complete discretion to grant or deny a franchise application based on a wide-ranging set of factors that include the applicant's "managerial, technical, financial, and legal qualifications to construct and operate a telecommunications system on County property" and "[w]hether the proposal will serve and protect the public interest." Sec. 5A–152(e)(1), (4). These factors relate to regulatory issues that go well beyond the bounds of legitimate local governmental regulation discussed in *TCI Cablevision* and *Classic Telephone, supra.* In addition, the ordinance provides no criteria to guide the county executive in carrying out his or her responsibility to negotiate franchise agreements, *see* Sec. 5A–152(g), and permits the County to refuse to renew franchises "in its sole discretion," Sec. 5A–153(f). Based on these and other similar provisions, the court agrees with Bell Atlantic that the ordinance "regulates providers of telecommunications services in the most comprehensive and utterly discretionary fashion," Pl.'s Opposition, p. 7, and that this far exceeds the County's authority "to manage the public rights-of-way" under section 253(c).

### (ii) fair and reasonable compensation

■■ The next issue to be addressed under section 253(c) involves the meaning of "fair and reasonable compensation." These terms are not defined by the FTA. Yet one thing is clear: the County is expressly authorized under section 253(c) to demand some type of "compensation" from telecommunications providers "for use of public rights-of-way." 47 U.S.C. § 253(c); *see also TCG Detroit v. City of Dearborn,* 16 F.Supp.2d 785, 789 (E.D.Mich.1998)

(explaining that there is "nothing inappropriate" under FTA about local governments charging compensation or "rent" for use of public property by telecommunications companies). The crucial point, however, is that any franchise fees that local governments impose on telecommunications companies must be directly related to the companies' use of the local rights-of-way, otherwise the fees constitute an unlawful economic barrier to entry under section 253(a). *See City of Dallas,* 8 F.Supp.2d at 593. For the same reason, the court also believes that local governments may not set their franchise fees above a level that is reasonably calculated to compensate them for the costs of administering their franchise programs and of maintaining and improving their public rights-of-way. Franchise fees thus may not serve as general revenue-raising measures.

These limitations on the authority of local governments to impose franchise fees on telecommunications companies are necessary to promote the full purposes and objectives of Congress in adopting the FTA. If local governments were permitted under section 253(c) to charge franchise fees that were unrelated either to a telecommunications company's use of the public rights-of-ways or to a local government's costs of maintaining and improving its rights-of-way, then local governments could effectively thwart the FTA's pro-competition mandate and make a nullity out of section 253(a). Congress could not have intended such a result. The legislative history further supports the conclusion that the purpose of section 253(c) is to enable local governments to recoup their investments in public rights-of-way by imposing "fair and reasonable" user fees on telecommunications companies, apportioned according to the companies' actual physical use of the rights-of-ways. *See* 141 Cong.Rec. H8460 (daily ed. Aug. 4, 1995) (statement of Rep. Stupak).[26]

---

**26.** Representative Bart Stupak, along with Representative Joe Barton, sponsored the

amendment which ultimately became section 253(c). In offering the amendment, Rep. Stu-

In this case, the County's telecommunications franchise law imposes a 3% "right-of-way charge" on each franchisee's annual gross revenues. Sec. 5A–154(a). The ordinance defines gross revenues very broadly. *See* Sec. 5A–150(a)(9). The County contends that this charge represents a fair and reasonable measure of the "value" of Bell Atlantic's "privilege" of using the County's public rights-of-way. Def.'s Reply, p. 21; *see* Sec. 5A–154(a). Bell Atlantic takes the position that the charge is not "fairly and reasonably relate[d] to use of the rights-of-way." Pl.'s Opposition, p. 25. In particular, Bell Atlantic argues that four of the components of gross revenue as defined by the ordinance are unrelated to Bell Atlantic's use of the County's public rights-of way: "gross revenues from long distance telecommunications services billed to a County address," Sec. 5A–150(a)(9)(B); "gross revenues from telecommunications services levied on a usage or usage sensitive" basis, Sec. 5A–150(a)(9)(C); "gross revenues collected from connection or disconnection fees," Sec. 5A–150(a)(9)(D); and "gross revenues from penalties or charges to customers for checks returned from banks . . . from recoveries of bad debts previously written off . . . [and] from sales of assignments of bad debts," Sec. 5A–150(a)(9)(E). *See* Pl.'s Opposition, pp. 26–27.

The court agrees that these four components of gross revenue do not appear to be directly related to Bell Atlantic's actual physical use of the County's public rights-of-way; consequently, they violate the FTA. There is a more fundamental error, however, in the manner in which the County has calculated its franchise fee. The appropriate benchmark is not the "value" of Bell Atlantic's "privilege" of using the County's public rights-of-way to provide telecommunications services in Prince George's County. Rather, the proper benchmark is the cost to the County of maintaining and improving the public rights-of-way that Bell Atlantic actually uses. Furthermore, to be "fair and reasonable," these costs must be apportioned to Bell Atlantic based on its degree of use, not its overall level of profitability. *See City of Dallas*, 8 F.Supp.2d at 593 (holding that city's requirement that telecommunications company pay franchise fee of 4% of its local gross revenues "contradicts the requirements of the FTA").[27] Since noth-

pak cited statistics showing that cities in the United States spent approximately $100 billion each year on public rights-of-way, but received only about $3 billion in return in user fees. *See* 141 Cong.Rec. H8460, H8460 (daily ed. Aug. 4, 1995). In the congressman's opinion, "it simply is not fair to ask the taxpayers to continue to subsidize telecommunications companies." *Id.* The telecommunications bill as originally proposed permitted local governments to charge telecommunications companies for use of the public rights-of-way; however, the bill would have required cities to impose the same fees on all telecommunications providers, "regardless of how much or how little they use the right-of-way or rip up our streets." *Id.* Rep. Stupak opposed this "parity" provision, arguing that, in setting user fee levels, cities "must be able to distinguish between different telecommunications providers" based on the extent and intensity of their right-of-way use. As the congressman explained, "if a company plans to run 100 miles of trenching in our streets and wires to all parts of the cities, it imposes a different burden on the right-of-way than a

company that just wants to string a wire across two streets to a couple of buildings." *Id.* In adopting the Barton–Stupak amendment, Congress expressly rejected the original bill's "parity" approach to telecommunications user fees. *See City of Dallas*, 8 F.Supp.2d at 594.

**27.** The court respectfully disagrees with the position taken by the district court in *TCG Detroit v. City of Dearborn*, 16 F.Supp.2d 785 (E.D.Mich.1998), which upheld a city-imposed telecommunications franchise fee of 4% of the plaintiff's gross revenues, in addition to a one-time payment of $50,000. *Id.* at 790–91. The court in *City of Dearborn* construed section 253(c) of the FTA as not "limit[ing] municipalities to strictly their costs related to telecommunications providers[,] use of their right-of-ways [sic]." *Id.* at 789. The plaintiff in that case had argued that the phrase "fair and reasonable compensation" found in section 253(c) of the FTA should be given the same meaning as the phrase "just and reasonable [rate]" found in section 224 of the Pole

ing in the ordinance indicates that the County set the level of its "right-of-way charge" based on these two factors, the court finds that the "right-of-way charge" violates the FTA.

(iii) using the public rights-of-way

■ A final, related question has to do with what it means under section 253(c) to "use" the public rights-of-way. Specifically, the issue is whether the County may impose franchise fees on telecommunications companies, like Sprint, that provide telecommunications services through lines and facilities owned, installed, and maintained by others, such as Bell Atlantic. *See* Sec. 5A–151(e). Bell Atlantic argues that this provision of the ordinance "goes beyond the protection of the County's rights-of-way" permitted under the FTA. Pl.'s Opposition, p. 5. The court agrees.[28]

As discussed previously, the FTA restricts the regulatory authority of local governments to the types of activities described by the FCC in *TCI Cablevision* and *Classic Telephone, supra.* These are activities that relate to the physical alteration, occupation, and restoration of the

public rights-of-ways. The FTA further prohibits local governments from imposing franchise fees that are unrelated to telecommunications companies' "use of public rights-of-way" or that are designed to compensate local governments in excess of the cost of maintaining and improving the rights-of-way. It is evident, then, that local governments may not regulate or demand compensation from telecommunications companies based solely on those companies' provision of telecommunications services. The regulation of telecommunications services is the province of the federal and state governments only. Consequently, the court believes that unless a telecommunications company doing business in Prince George's County physically impacts the public rights-of-way by installing, modifying, or removing telecommunications lines and facilities, it is not "using" the rights-of-way within the meaning of section 253(c), and the County may not charge it a franchise fee.

The same issue was discussed by the district court in *AT & T Communications of the Southwest, Inc. v. City of Austin,*

---

Attachment Act, which under the latter statute limits recovery "to the costs of the utility." *Id.* In rejecting the plaintiff's interpretation of section 253(c), the district court carefully distinguished the two statutes, *id.*, but it did not address the various reasons intrinsic to the FTA that this court finds persuasive for limiting the franchise fees imposed by local governments to the costs of maintaining and improving the local public rights-of-way.

**28.** The County suggests that Bell Atlantic lacks standing to challenge this particular aspect of the telecommunications franchise law. *See* Def.'s Reply, p. 4 n. 4. The court disagrees. First, the County's decision to extend its franchise requirement to companies, like Sprint, which offer telecommunications services using lines and facilities leased from Bell Atlantic threatens to injure Bell Atlantic's commercial prospects of receiving rental income from such companies because it makes doing business in Prince George's County for such companies more costly. Overturning the franchise requirement will redress this injury. Thus, the "irreducible constitutional minimum of standing" is satisfied. *See Burke v. City of Charleston,* 139 F.3d 401, 405 (4th

Cir.1998) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Second, the FTA not only anticipates, but mandates that incumbent local exchange carriers, like Bell Atlantic, lease their lines, facilities, and services to newcomers to local telecommunications markets. *See* 47 U.S.C. § 251(c); *AT & T Corp. v. Iowa Utils. Bd.,* — U.S. —, ———–——, 119 S.Ct. 721, 726–27, 142 L.Ed.2d 835 (1999). At the same time, section 253(a) of the FTA expressly prohibits local governments from interfering with "the ability of any entity to provide any interstate or intrastate telecommunications service." Since the County's decision to apply the franchise requirement to companies like Sprint will necessarily affect Bell Atlantic's ability to conduct its own telecommunications business, the court believes that Bell Atlantic's complaint on this issue "fall[s] within the zone of interests the statute ... protects or regulates." *Burke,* 139 F.3d at 405 (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Thus, the prudential limitation on standing is also satisfied.

975 F.Supp. 928 (W.D.Tex.1997). In *City of Austin,* AT & T sought to enter the local telephone services market by reselling services purchased from the incumbent local exchange carrier, Southwestern Bell Telephone Company, and by providing its own services through Southwestern Bell's existing lines and facilities. *Id.* at 934. Although AT & T did not own or maintain any lines or facilities of its own, the city nevertheless required it to comply with the provisions of the city's "extremely comprehensive" telecommunications ordinance. *Id.* at 934–35. This ordinance required telecommunications companies seeking to do business in Austin, *inter alia,* to provide detailed financial, organizational, and legal information; to pay quarterly franchise fees; and to obtain municipal consent before being permitted to operate in the city. *Id.*

In its lawsuit, AT & T challenged the Austin ordinance on numerous federal and state statutory and constitutional grounds, including preemption under the FTA. In granting AT & T's motion for a preliminary injunction, the court found that there was a substantial likelihood that AT & T would prevail on the merits of its FTA claim. *Id.* at 939–41. The court also found that a "non-facilities-based provider," like AT & T, could not be charged for "using" the local public rights-of-way. As the court explained:

> The City's interest in regulating local telephone service providers is limited by federal and state law to managing and demanding compensation for the use of the City's public rights-of-way. The City's unsupported assertion that a non-facilities-based provider is "using" the City's public rights-of-way is wholly unpersuasive. In fact, it is a metaphysical interpretation of the term "use" that defies logic and common sense.

*Id.* at 942–43.

Prior to final judgment in the case, the city renewed its argument that AT & T was using the city's rights-of-way and therefore was subject to the ordinance's requirements. *See AT&T Communications, Inc. v. City of Austin,* 40 F.Supp.2d 852, 853 (W.D.Tex.1998). The city argued that AT & T was physically occupying the public rights-of-way because the signals AT & T transmitted using Southwestern Bell's facilities consisted of electrons and lightwaves that traveled through lines, cables, and switches located in the city's rights-of-way. *Id.* at 853. The court rejected this argument as "border[ing] on the absurd" and reiterated its earlier finding that AT & T was not "using" the public rights-of-way within the meaning of section 253(c). *Id.* In the court's view, the "essential point" was that AT & T "will not erect telephone poles or dig holes in the City's streets in order to install, maintain, operate, or repair [Southwestern Bell's] network." *Id.*

This court similarly concludes that, consistent with section 253(c), the County may not require telecommunications companies which provide telecommunications services through lines and facilities owned by others to obtain a franchise or pay any franchise fees before offering such services in Prince George's County. Section 5A–151(e) of the County's telecommunications franchise law is therefore preempted by the FTA. In addition, any other provision of the ordinance that is not directly related to telecommunications companies' "use of public rights-of-way," as that phrase is herein defined, violates the FTA.

### III. Severability

The County's telecommunications franchise law contains an express severability clause. "State law—herein, the law of Maryland—governs determination of severability of a state statute." *Muller v. Curran,* 889 F.2d 54, 57 (4th Cir.1989). Under Maryland law, "[w]hile an entire act need not always be struck down because one or more of its provisions is void, the entire act must fall when the provisions are so connected that it cannot be presumed that the Legislature would have passed one without the other." *Park v. Board of Liquor License Comm'rs,* 338

Md. 366, 382, 658 A.2d 687, 695 (1995) (internal quotation marks and citation omitted). The test is whether "the legislative body [would] have enacted the statute or ordinance if it knew that part of the enactment was invalid." *Id.* (internal quotation marks and citation omitted).

In this case, given the number and variety of provisions of the County's telecommunications franchise law that are preempted by the FTA, the court does not believe that attempting to sever the invalid from the valid provisions would be appropriate. At a minimum, the FTA preempts substantial portions of the ordinance dealing with the franchise application and approval process, the calculation and apportioning of rights-of-way charges, and the extension of the franchise requirement to telecommunications companies and services that do not use the County's rights-of-way. Under these circumstances, the court cannot find that the County would have enacted the remaining portions of the ordinance separately. The County itself took the position at oral argument that these provisions of the ordinance essentially were not severable. *See* Hearing Trans. pp. 39–43. Thus, the entire ordinance must be struck down on federal preemption grounds.[29]

## IV.  Bell Atlantic's State Law Claims

In addition to its federal statutory and constitutional claims, Bell Atlantic argues that the County's telecommunications franchise law must be struck down on numerous state law grounds. *See* Compl. ¶¶ 63–93 (Counts VI–IX). These arguments merit a brief discussion, but need not be resolved by this court.

First, Bell Atlantic argues that the authority to decide which telecommunications companies are qualified to do business in Prince George's County, or anywhere else in the state for that matter, has been delegated by the state legislature exclusively to the Maryland Public Service Commission. Bell Atlantic claims that the County is therefore preempted under state law from enacting any local regulations that purport to evaluate the technical, financial, or organizational qualifications of telecommunications companies seeking to do business in the county or that otherwise permit the County to deny telecommunications companies access to the County's public rights-of-way. *See* Pl.'s Opposition, pp. 14–19.

Second, Bell Atlantic argues that the County in its charter has not been authorized by the state legislature to impose any fees on telecommunications companies for the companies' use of the County's public rights-of-way. *See id.,* pp. 20–24.

Third, Bell Atlantic argues that the ordinance violates the terms of the company's perpetual, statewide franchise that it claims to have received from the Maryland legislature in 1884. According to Bell Atlantic, the terms of this franchise permit Bell Atlantic to use the public rights-of-way throughout the state free of any right-of-way charges or other burdensome local regulations. *See id.,* pp. 32–43.

And fourth, Bell Atlantic argues that the ordinance violates the terms of a perpetual local telephone services contract allegedly entered into by Bell Atlantic and Prince George's County in 1904. *See id.,* p. 49.[30]

29. Since the court finds that the County's telecommunications franchise law fatally conflicts with the terms and goals of the FTA, the court declines to address Bell Atlantic's alternative federal constitutional and 42 U.S.C. § 1983 claims. *See* Compl. ¶¶ 19–53 (Counts I–IV). To do otherwise is both unnecessary and improper. Moreover, the court will deny Bell Atlantic's request for damages, costs, and attorneys' fees under 42 U.S.C. § 1988(b). *See Maryland Pest Control Ass'n v. Montgom-* *ery County,* 884 F.2d 160, 163 (4th Cir.1989) (per curiam) (holding that "federal preemption of local ordinances pursuant to the Supremacy Clause is not actionable under Section 1983. Therefore, there can be no award of attorney's fees under Section 1988").

30. Bell Atlantic also raises state constitutional claims under the Maryland Declaration of Rights which closely parallel its federal constitutional claims.

822

Although the parties have briefed each of these four issues extensively, the court does not believe it is necessary to resolve these complex and important state law questions in order to decide this case. For even accepting the County's position that the County possessed the authority under state law to adopt its telecommunications franchise law, the ordinance still must be struck down on the grounds that it fatally conflicts with the terms and goals of the FTA.

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. Prince George's County's motion to dismiss is **denied;**

2. Bell Atlantic's opposition to the County's motion to dismiss, treated as a motion for judgment on the pleadings, is **granted;**

3. Prince George's County ordinance CB–98–1998 is **declared preempted** under the Federal Telecommunications Act of 1996, 47 U.S.C. § 251 *et seq.*

4. Prince George's County is **permanently enjoined** from enforcing Prince George's County ordinance CB–98–1998;

5. Bell Atlantic's motion for preliminary injunction is **denied** as moot;

6. Bell Atlantic's request for attorneys' fees, damages, and costs is **denied;** and

7. Copies of this Order and the accompanying Memorandum shall be mailed to counsel of record.