John F. GRITZER; Donald J. Leonard; Crawford Williams; John Palacki; Donald S. Majorsky; Ken Smetak; Tom McChesney; Thomas Cawoski, for themselves and others similarly situated,

v.

CBS, INC; Westinghouse Pension Plan John F. Gritzer, Donald J. Leonard, Crawford Williams, John Palacki, Donald Majorsky, Ken Smetak, Tom McChesney, and Thomas Cawoski, Appellants.

No. 01–1979.

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 2001.

Jan. 3, 2002.

William T. Payne, (Argued), Schwartz, Steinsapir, Dohrmann & Sommers, and John Stember, and John T. Tierney, III, Goldberg, Persky, Jennings & White, Pittsburgh, PA, and Daniel P. McIntyre, Miami Beach, FL, Attorneys for Appellants.

Glen D. Nager, (Argued), Jones, Day, Reavis & Pogue, Washington, DC, Attorneys for Appellees.

Before: MANSMANN, ALITO, and BARRY, Circuit Judges.

## OPINION OF THE COURT

BARRY, Circuit Judge.

This case, at bottom, is about whether the word "may" means "may" or whether it means "must." We are also called upon to determine the appropriate standard of review where a pension plan allows for discretion but discretion is not exercised. The District court granted the defendants' motion for summary judgment. We have jurisdiction under 28 U.S.C. § 1291 and will affirm.

## I.

In spite of the voluminous record and the lengthy briefs, this is, again at bottom, a contract interpretation class action with some ERISA bells and whistles. Appellants are a group of employees who worked at Westinghouse Electric Corporation's industrial ceramics plant in Derry, Pennsylvania. Appellants enjoyed coverage under the Westinghouse Pension Plan ("Plan") and purport to represent all employees from the 53 different facilities that were transferred by Westinghouse to successor companies and were extended at least some benefits under the Plan for time spent with the respective successors.

In December 1985, Westinghouse sold the Derry facility to Industrial Ceramics, Inc. ("Ceramics").[1] As part of that transaction, the Derry employees, including appellants, were transferred to Ceramics. This employee transfer forced Westinghouse to decide how it wanted to treat these employees' service with Ceramics for purposes of the Plan. Westinghouse executed a reciprocal service agreement ("RSA") with Ceramics.[2] The RSA provided, in pertinent part, that Westinghouse would grant transferred employees "service credit for their service with [Ceramics] for the purpose of pension eligibility under any applicable [Westinghouse] pension plan in which the employes [sic] may have been participating, but not for purposes of pension benefit accrual thereunder." JA 1030, P 8.8. The notices provided to appellants stated that they would "CONTINUE TO ACCRUE ELIGIBILITY SERVICE UNDER THE ... PLAN FOR AS LONG AS [THEY WERE] CONTINUOUSLY EMPLOYED BY [CERAMICS]. SUCH ELIGIBILITY SERVICE WILL ... DETERMINE WHEN

1. Westinghouse itself was subsequently sold to CBS Corporation (incorrectly identified as "CBS, Inc." in the caption of the complaint), which in turn merged into Viacom Inc. CBS and the Plan are the appellees in this case. Because Westinghouse and its Plan are the major players in the events at issue here, we will refer to "Westinghouse" throughout this opinion.

2. There are 53 such RSAs—one for each divested facility—each containing different language.

YOU BECOME ELIGIBLE FOR EARLY OR SELECTED RETIREMENT." JA 1568. Under the RSA, therefore, Westinghouse agreed to credit its former employees with Eligibility Service time under the Plan for the years subsequently spent with Ceramics.

Ten years later, appellants were engaged in a protracted strike at the Derry plant. Apparently at least in part as a result of the strike, Ceramics closed the plant and terminated appellants. It is undisputed that at the time of the Derry plant closure in 1995, each appellant was more than 50 years old and had 25 years of service with Westinghouse/Ceramics. Accordingly, appellants met the age and years of service requirements for the Plan's "Special Retirement Provisions" benefits ("50/25 benefits"). As discussed below, however, there is a significant dispute over whether appellants met the additional requirement of being terminated by an "Employer."

Following the plant closure, appellants inquired about their pensions. Alarmed by the lower-than-expected dollar amounts because 50/25 benefits begin earlier than the benefits which were extended and are not actuarially reduced, appellants began their quest for 50/25 benefits. After several unsuccessful inquiries, appellants filed a claim letter with the Plan Administrator. The Plan Administrator failed to respond within 90 days and appellants' claim was thereby deemed "denied." Based on this denial, appellants filed suit in the U.S. District Court for the Western District of Pennsylvania. Nearly five months later, Westinghouse finally responded to appellants' claim and denied it on the merits for essentially the same reasons that Westinghouse invokes here.

The complaint before the District Court—the Second Amended Complaint— set forth two counts, but only Count I is relevant here. Count I alleged that appellants were entitled under the Plan to 50/25 benefits and that the failure to award 50/25 benefits violated ERISA. The District Court certified the class, finding, as appellants contended, that the "common questions" as to Count I were (1) whether Westinghouse was obligated to award 50/25 benefits when it treated service with a successor company as service with Westinghouse, and (2) whether a successor's termination of class members was equivalent to a Westinghouse termination, thus amounting to a "Permanent Job Separation" such that whenever Westinghouse entered into an RSA treating service with a successor company as service with Westinghouse, it was necessarily including the 50/25 benefits in that RSA, regardless of whether the RSA said so and even if it expressly excluded such benefits. It is not disputed that what was at issue before the District Court and what is at issue before us is the meaning of the Plan language regarding eligibility service, job separation benefits, and a sale of assets. As Westinghouse puts it, "there is no claim in this case that the various, differently worded RSA agreements themselves entitle the class to [50/25] benefits; on the contrary, this class action claims that the Plan itself entitled [the] Gritzer class to these benefits, and that the various RSAs unlawfully failed to provide those benefits." Appellees' Br. at 20.

With these common class questions in mind, the parties cross-moved for summary judgment. The District Court granted Westinghouse's motion because the Plan's definition of "Permanent Job Separation" unambiguously requires termination by an "Employer" and Ceramics concededly did not meet this definition, and because the language of § 14(F)(1) of the Plan—and more about that later—did not require Westinghouse to offer all of its

Plan benefits whenever it chose to offer some of those benefits as part of a RSA. In reaching this conclusion, the District Court reviewed Westinghouse's denial of benefits under a heightened standard of deferential review and declined to consider the extrinsic evidence proffered by appellants in construing the relevant provisions of the Plan.

## II.

■ Before turning to the contractual issues in this case, and particularly whether "may" means "may," it is appropriate to address a predicate issue: whether the District Court utilized the correct standard of review when considering Westinghouse's denial of 50/25 benefits. Our review of the District Court's decision in this regard is plenary.

■ Appellants contended before the District Court, and contend before us, that de novo review was appropriate. Westinghouse, not surprisingly, argued—and argues here—for an arbitrary and capricious standard. The District Court disagreed with both sides and held that a heightened arbitrary and capricious standard was applicable—"arbitrary and capricious" because Westinghouse had unfettered discretion to interpret the Plan and "heightened" because it was operating under a financial conflict of interest when it denied the 50/25 benefits. Had discretion in fact been exer-

cised in the course of denying benefits we would agree, but it was not. We, thus, conclude that the District Court erred and that the denial of benefits should have received de novo review.

■ The Supreme Court has held that denials of benefits challenged under 29 U.S.C. § 1132(a), like the denials challenged here, are to be reviewed de novo unless the plan under consideration gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case an arbitrary and capricious standard applies. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In dicta, the Court noted that if a plan permitted an administrator to exercise discretion and the administrator was operating under a conflict of interest, that conflict must be weighed as a factor in applying the arbitrary and capricious standard. *Id.*[3]

■ It is undisputed that Westinghouse funds the Plan and that the Plan gives Westinghouse essentially unfettered discretion to interpret the Plan and to determine entitlement to its various benefits. So far, so good. Here, however, Westinghouse apparently never made any effort to analyze appellants' claims much less to advise them of what that analysis disclosed until after this litigation was filed.[4] As

3. Chief Judge Becker recently did an exhaustive analysis of this dicta and concluded that a "sliding scale" is appropriate when applying the arbitrary and capricious standard to account for any potential conflict of interest. *Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377 (3d Cir.2000). Under this "sliding scale," a court should examine how the plan is funded, if the plan is administered by an entity independent from the employer-employee relationship, whether the decisionmaker has any reason to be concerned about employer-employee relations, and the amount of money that is at stake in the decision at issue. *Id.* at 388–93. In other words, a court

should look at any and all factors that might show a bias and use common sense to put anywhere from a pinky to a thumb on the scale in favor of the administrator's analysis and decision.

4. Westinghouse contends that it effectively provided its "reasons" because (1) appellants were aware of Westinghouse's "general" policy of denying such claims; and (2) Westinghouse did eventually provide a written response, albeit after this litigation commenced. This contention is unpersuasive. General policy announcements and post-commencement-of-litigation determinations under the aegis of

appellants note, "[i]n these circumstances, there simply is no analysis or 'reasoning' to which the Court may defer under the arbitrary and capricious standard." Appellants' Reply Br. at 7.

■ The District Court summarily rejected this contention, holding that *Firestone* precluded de novo review whenever a plan simply allows for discretion, regardless of whether such discretion was exercised. This reads *Firestone* too narrowly. It is important to recall that the *Firestone* rule was predicated on basic trust law principles. Where a trustee fails to act or to exercise his or her discretion, de novo review is appropriate because the trustee has forfeited the privilege to apply his or her discretion; it is the trustee's analysis, not his or her right to use discretion or a mere arbitrary denial, to which a court should defer. *Moench v. Robertson,* 62 F.3d 553, 567 (3d Cir.1995) (stating that de novo review was appropriate "because the record is devoid of any evidence that the Committee construed the plan at all. Thus, this is not a case implicating the arbitrary and capricious standard of review. . . . The deferential standard of review of a plan interpretation 'is appropriate only when the trust instrument allows the trustee to interpret the instrument *and when the trustee has in fact interpreted the instrument'* ") (quoting *Trustees of Central States, Southeast and Southwest Areas Health & Welfare Fund v. State Farm Mutual Auto. Ins.,* 17 F.3d 1081, 1083 (7th Cir.1994)) (citations omitted); *id.* at 568 (citing *Firestone* for the proposition that a de novo standard is appropriate when the decisionmaker did not actually exercise its discretion).[5]

## III.

■ We turn, finally, to the heart of this appeal. Simply stated, appellants claimed before the District Court, and argue here, that they were entitled to $^{50}\!/_{25}$ benefits under § 14(F)(1) of the Plan. Westinghouse contended, and the District Court agreed, that Westinghouse extended some benefits when appellants were transferred, but not $^{50}\!/_{25}$ benefits. We exercise plenary review over the District Court's grant of summary judgment.

To better understand the District Court's disposition of the case, it is helpful to first consider the relevant Plan provisions.[6] Westinghouse is the "sponsor" and "fiduciary" of the Plan, and also funds the Plan. Under the Plan, Administrative Managers are responsible for day-to-day

attorneys are not benefit eligibility analyses by a plan administrator to which a court must defer.

**5.** *See also, e.g., Marolt v. Alliant Techsystems, Inc.,* 146 F.3d 617, 620 (8th Cir.1998) ("The fact is, the [Plan Administrator] did not provide a rationale for its decision. . . . [W]e are free to ignore ERISA plan interpretations that did not actually furnish the basis for a plan administrator's benefits decision.") (citations omitted); *Mansker v. TMG Life Ins.,* 54 F.3d 1322, 1328 (8th Cir.1995) ("[W]e hold that the consequence of [the Plan Administrator's] failure to render a decision on certain issues concerning [an employee's] medical expenses is that the district court could . . . decide the issues de novo."); Restatement (Second) of Trusts § 187, cmt. (h) ("[I]f the trustee without knowledge of or inquiry into the relevant circumstances and merely as a result of his arbitrary decision or whim exercises or fails to exercise a power, the court will interpose."), *cited with approval by Moench,* 62 F.3d at 568; *accord Matuszak v. Torrington Co.,* 927 F.2d 320, 322–23 (7th Cir.1991) (applying de novo review where administrator only offered "reasons" for denial during the course of litigation).

**6.** While we refer throughout this opinion to the 1994 Plan, we note that the provisions relevant here have not been substantively changed since 1985 when Westinghouse sold the Derry facility to Ceramics and appellants were transferred.

management and have "full and absolute discretion and authority to control and manage the operation and administration of the Plan, and to interpret and apply the terms of the Plan." JA 665.

The Plan provides a variety of benefits, which can generally be broken down into "Normal," "Early," and "Special" retirement benefits. Employees qualify for these various benefits by meeting certain "eligibility service" and "credit service" benchmarks. Credit service includes the time spent at work with an employer and certain time away from work such as time spent on (1) furlough, (2) disability, (3) general leave of absence, (4) union leave of absence, (5) maternity leave of absence, or (6) military leave of absence. Credit service is used to determine the *amount* of an employee's pension. Eligibility service includes all credit service time plus certain periods when "the employee is separated from service by reason of a quit, discharge, release or retirement," so long as the employee "was re-employed" or "returned to work" within one year. Eligibility service is used to determine an employee's *eligibility* for benefits.

It is the "Special" retirement benefits section and, more particularly, 50/25 benefits, that is at the core of this dispute. If an employee is (1) 50 years of age; (2) has 25 or more years of eligibility service; and (3) suffered a permanent job separation, he or she may collect these special benefits. Accordingly, unlike other Plan benefits, to collect 50/25 benefits employees cannot merely meet the age/service benchmarks, as appellants did, but must also suffer a permanent job separation.

The critical question before the District Court was whether appellants satisfied the permanent job separation requirement,

which required the "Employer" to terminate the employee because of a plant close down or some other similar "no-fault" termination. "Employer" simply means Westinghouse. It is undisputed that Ceramics, or any other successor company for that matter, does not qualify as an "Employer" under the express terms of the Plan. To circumvent this seemingly fatal flaw in their case, appellants point to what they describe as the unambiguous language of § 14(F)(1) and contend as well that extrinsic evidence, including Westinghouse's course of dealing with that provision, tacitly made successor companies employers for purposes of 50/25 benefits. Appellants are wrong.

Section 14 governs employees, such as appellants, who were hired by successor companies when a Westinghouse facility was transferred. Section 14(F)(1) provides:

> [T]he Administrative Managers and Financial Managers *may*, by regulations or otherwise and *to the extent they consider advisable*, treat service with [a successor company] as service with [Westinghouse] for purposes of vesting and for determining eligibility for any pensions accrued to the date of such transfer or any other benefits under this Plan which are dependent on a service-eligibility requirement.

JA 675 (emphasis added).[7] Administrative and Financial Managers would typically exercise their powers under this provision through an RSA. As discussed below, appellants' case hinges on interpreting this text as *compelling* the Administrative and Financial Managers to treat a successor company as an employer for 50/25 benefits whenever they treated service with such a

---

**7.** When appellants were transferred in 1985, the Pension Plan Administration Committee, as opposed to the Administrative and Finan-

cial Managers, had the authority to define service with the successor company.

company as service for the service-eligibility requirements of any Plan benefit.

In this connection, it is important to understand that the District Court was not asked, and we are not being asked, to determine whether the 1985 RSA between Westinghouse and Ceramics contractually extended 50/25 benefits to appellants. Rather, the issue is whether Westinghouse, by extending some benefits under the Plan through its RSA with Ceramics, automatically or necessarily by virtue of § 14(F)(1) extended 50/25 benefits. Appellants contend that the text of § 14(F)(1), by itself, unambiguously compels an award of 50/25 benefits.[8]

Turning first to the text of the Plan, § 14(F)(1) simply *authorizes* Westinghouse, in its discretion, to treat service with a successor company as service with Westinghouse for purposes of pension eligibility for some or all of the Plan benefits. The "may" and "to the extent they consider advisable" language highlighted above unambiguously establishes discretion to pick and choose which benefits, if any, will continue to accrue eligibility service after a transfer. Simply stated, Westinghouse did not have to extend 50/25 benefits; indeed, nothing in § 14(F)(1) required Westinghouse to extend any benefits at all.

Appellants try to escape this conclusion by looking to several other words or phrases in § 14(F)(1) and in other provisions, almost wholly ignoring the critical "may" and "to the extent they consider advisable" language. We will not unnecessarily extend this opinion by identifying and rejecting each of the words or phrases raised to us and each of the contractual interpretation and related arguments. Suffice it to say that none of them renders "may" and "to the extent they consider advisable" ambiguous. In this regard, it is important to remember that this is a class action that involves only a limited question: does § 14(F)(1) mandate an award of 50/25 benefits? The answer is unambiguously "no."

■ Appellants' proffered extrinsic evidence does not alter this conclusion. We note, in this connection, that the District Court erred in its blanket refusal to consider this extrinsic evidence offered to support appellants' argument that relevant provisions of the Plan unambiguously required the award of 50/25 benefits or, failing that, that the extrinsic evidence rendered at least certain of those provisions ambiguous. Extrinsic evidence may be used for this purpose although it may not, of course, be used "to create an ambiguity where none exists." *International Union v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir.1999); *see also Einhorn v. Fleming Foods of Pa., Inc.*, 258 F.3d 192, 194–95 (3d Cir.2001). Appellants point, for example, to the fact, and fact it be, that to the extent benefits were extended, Westinghouse did not consider the transferred employees to be terminated by it, the "Employer." This, however, simply begs the question of whether 50/25 benefits were extended in the first place. Moreover, the "course of dealing" evidence as concerns the various RSAs only establishes that Westinghouse treated § 14(F)(1) like the "pick-and-choose" provision it is, extending 50/25 benefits in some cases and excluding them or being

---

**8.** At oral argument, appellants attempted to reframe the issue, contending that if we were to find that § 14(F)(1) is a "pick-and-choose" provision, reversal would be called for because each of the 53 RSAs would need to be analyzed separately to determine whether 50/25 benefits were extended in any of them. This contention is utterly without merit given appellants' decision to restrict the certified class question to whether or not § 14(F)(1), standing alone, mandates 50/25 benefits.

ambiguous about them in others. We have no hesitancy in finding that, had the District Court considered the proffered extrinsic evidence, it would have reached the same conclusion—50/25 benefits were clearly not mandated by the Plan.

## IV.

We will affirm the order of the District Court.