[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 25, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12346

_____

D. C. Docket No. 01-00230-CV-HS-S

KENNETH MCCAY,
JOHN BRANNON,
CLIFFORD HAWTHORNE,
PAUL JONES,

Plaintiffs-Appellants,

versus

SIEMENS CORPORATION,
SIEMENS WESTINGHOUSE
RETIREMENT PLAN FOR UNION
EMPLOYEES,
CBS CORPORATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(July 25, 2007)**

Before EDMONDSON, Chief Judge, and BIRCH and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

Kenneth McCay, John Brannon, Clifford Hawthorne, and Paul Jones (collectively "the terminated employees") appeal contending that the district court erred in granting CBS Corporation ("CBS"), Westinghouse Pension Plan ("Westinghouse Plan"), Siemens Corporation ("Siemens"), and Siemens Westinghouse Retirement Plan for Union Employees ("Siemens' Plan") summary judgment, finding that termination of a layoff benefit by amendment to the Westinghouse Plan was not a violation of the anti-cutback provision, 29 U.S.C. § 1054(g), or 29 U.S.C. § 1058, of the Employee Retirement Income Security Act ("ERISA"). We AFFIRM.

## I. BACKGROUND

The terminated employees are former employees of both Westinghouse Electric Corporation, a predecessor to CBS, and Siemens, the purchaser of the assets of Westinghouse's Power Generation Business Unit ("PGBU"). They initially worked at the Westinghouse Power Generation Repair Shop, which was one of several facilities in the PBGU. CBS was the employer before 19 August

1998, but its pension plan at issue was named the Westinghouse Plan.[1]

The terminated employees seek special retirement benefit referred to in the Westinghouse Plan as the Permanent Job Separation ("PJS") benefit.[2] PJS benefits had been offered under the Westinghouse Plan before the sale, but not by any of the separate pension plans established by Siemens Power Generation Corporation ("Siemens") after the sale for the former employees of Westinghouse's PGBU.

Under section 19 of the Westinghouse Plan, CBS employees could become eligible for PJS benefits if they (1) satisfied stated age and service requirements, (2) did not qualify for normal retirement benefits, and (3) were terminated from their employment with Westinghouse "as a result of a Permanent Job Separation." R3-47, Exh. C at 65. The Westinghouse Plan stated that "[I]n no event shall a [PJS] occur if an Employee is offered continued employment by . . . a successor employer . . . ." Id. at 13.

CBS and Siemens entered into negotiations for the sale of Westinghouse's PGBU in 1997. On 14 November 1997, CBS and Siemens entered into an Asset Purchase Agreement ("APA"). The APA specified that the Westinghouse Plan

---

[1] Because CBS is the plan sponsor and administrator of the Westinghouse Plan, and is a successor to Westinghouse, we refer solely to CBS.

[2] PJS benefits are a subsidy added to the pension benefits of qualifying employees who meet certain age and seniority requirements and are terminated "through no fault of [their] own for lack of work for reasons associated with the business." R3-47, Exh. C at 12-13.

3

"shall retain liability with respect to Business Employees for their accrued benefit calculated as of the Closing Date," subject to agreed upon adjustments.  Id., Exh. D at 56-57.

Regarding PJS benefits, the APA dictated that:

[Siemens's] Plan shall be solely responsible for . . . any benefits pursuant to Section 19 of the [Westinghouse] Plan, in excess of the benefits that would otherwise be payable if those sections did not apply, with respect to a Business Employee who retires or terminates employment with the Purchaser and its Affiliates after the Closing Date.

Id. at 57-58.

The APA was amended before the sale closed on 19 August 1998, which was the time the Westinghouse PGBU employees became employed by Siemens. One amendment provided that the closing date for pension purposes would be 1 September 1998, when the Siemens pension plans for legacy CBS employees would take effect.  Under this amendment, CBS promised to bridge the Westinghouse PGBU employees by giving them eligibility credit, vesting credit, and limited pension service credit under the Westinghouse Plan for service with Siemens between 19 August 1998 and 31 August 1998.  Siemens assured CBS that it would not discharge any of the transferred employees without cause between those dates.

The former Westingthouse PGBU employees' coverage under Siemens's

4

pension plan began 1 September 1998. Siemens alone funds and sponsors the Siemens plan. Siemens did not include PJS benefits in its plan that began on that date. Pursuant to APA 5.5(a)(ii)(A), Hewitt Associates LLC certified that Siemens's benefits were "in the aggregate comparable" to those provided by CBS, and thus compliant with the APA.

In January 1999, Siemens announced it was closing the Westinghouse PGBU facility in March 1999. In February 1999, the terminated employees filed a grievance under their collective bargaining agreement between International Brotherhood of Electrical Workers and Siemens claiming they were entitled to PJS benefits. After the facility closed and Siemens had terminated the Westinghouse PGBU employees, the terminated employees requested PJS benefits from CBS, arguing, in part, that CBS was barred from cutting back their PJS benefits. The CBS Administrative Managers denied the terminated employees' PJS benefits claim, noting that under the terms of the Westinghouse Plan, employees who were "offered continued employment by . . . a successor employer which is neither an Employer, Affiliated Entity, nor an Excluded Unit" could not suffer a Permanent Job Separation, and Siemens was a successor employer. R3-47, Exh. N at 10 (citing id., Exh. C at 13). Moreover, they reasoned that the terminated employees had not qualified for PJS benefits from CBS when they were fired by Siemens in

March 1999 because only CBS employees could qualify for those benefits under the Westinghouse Plan and the terminated employees no longer worked for CBS in March 1999.

The terminated employees sued CBS, the Westinghouse Plan, Siemens, and the Siemens Plan for PJS benefits that were not provided to them upon their separations from employment with CBS and Siemens. The district judge granted summary judgment to all defendants, finding that the terminated employees did not state a claim under the "anti-cutback" rule found in 29 U.S.C. § 1054(g), because they did not qualify for PJS benefits under the terms of the Westinghouse Plan. Moreover, the district court held that the terminated employees did not state a claim under 29 U.S.C. § 1058, because there was no evidence that the Westinghouse Plan and the Siemens Plan had transferred assets or liabilities between each other, as is necessary for § 1058 to apply. The district court granted summary judgment to CBS, the Westinghouse Plan, Siemens, and the Siemens Plan. Plaintiffs appealed the district court's grant of summary judgment.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. Cruz v. Publix Super Markets, Inc., 428 F.3d 1379, 1382 (11th Cir. 2005) (citation omitted). As discussed in Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132,

1137-38 (11th Cir. 2004), we apply a multi-step approach to a review of a denial of ERISA benefits. First, a court is to conduct a de novo review to determine whether the decision-makers' interpretation was "wrong." Id. at 1138. If we conclude the decision-makers' interpretation was correct, our inquiry ends. Id.

Second, "[i]f the [decision-makers'] decision in fact is 'de novo wrong,' then [the court is to] determine whether [the decision-makers were] vested with discretion in reviewing claims." Id. (footnote omitted). Under ERISA, "a deferential standard of review [is] appropriate when a [decision maker] exercises discretionary powers." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 109 S. Ct. 948, 954 (1989) (citation omitted). Here, under section 12 of the Westinghouse Plan, the Westinghouse Administrative Managers have "full and absolute discretion and authority to control and manage the operation and administration of the [Westinghouse] Plan, and to interpret and apply the terms of the [Westinghouse] Plan and the Trust Agreement." R3-47, Ex. C at 45. Therefore, the arbitrary and capricious standard governs our review of the Westinghouse Administrative Managers' interpretation and application of the provisions of the Westinghouse Plan. See, e.g., Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989).

Third, "[i]f the [decision-makers'] decision is 'de novo wrong,' and [the

decision-makers were] vested with discretion in reviewing claims, then [the court] determine[s] whether 'reasonable' grounds supported it (hence, review [the decision-makers'] decision under the more deferential arbitrary and capricious standard)." Williams, 373 F.3d 1338 (footnote omitted). A reasonable decision must be upheld "even if there is evidence that would support a contrary decision." Jett, 890 F.2d at 1140. A "wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable." HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 994 (11th Cir. 2001).

Fourth, "[i]f no reasonable grounds exist, then [the court] end[s] the inquiry and reverse[s] the [decision-makers'] decision; if reasonable grounds do exist, then [the court] determine[s] if [the decision-makers] operated under a conflict of interest." Williams, 373 F.3d at 1138. The use of a trust-based funding structure "eradicates any alleged conflict of interest so that the arbitrary or capricious standard of review applies." Turner v. Delta Family-Care Disability & Survivorship Plan, 291 F.3d 1270, 1273 (11th Cir. 2002) (per curiam).

Fifth, if the decision-makers made a wrong yet reasonable decision and have discretionary authority without a conflict of interest, then the inquiry ends and the decision must be affirmed. Williams, 373 F.3d at 1137-38.

8

## III. DISCUSSION

The terminated employees claim that the combination of transactions between CBS and Siemens violate 29 U.S.C. §§ 1054(g) and 1058. Essentially, the terminated employees argue that CBS and Siemens attempted to do together what neither could legally do by itself. They contend that CBS could not cut back the protected benefits and then lay off the plaintiffs without violating ERISA and Siemens could not hire the plaintiffs with the protected benefits in place and then decrease the benefits without violating ERISA. As a result, the terminated employees assert, CBS terminated the accrued benefits and Siemens terminated the employees.

### A. 29 U.S.C. § 1054(g)

The terminated employees argue that the district court erred in concluding that without merger of assets, there was no cut-back under the anti-cutback provision of ERISA. CBS responds that the terminated employees failed to qualify for a benefit under pre-amendment plan terms because they were "offered continued employment by . . . a successor employer," R3-47, Ex. C at 13, Siemens, and hence cannot claim the protection of the anti-cutback provision. Moreover, the anti-cutback provision only bars plan amendments that have the effect of eliminating or reducing an early retirement benefit for which the participant would

9

be otherwise eligible, and here, the Administrative Managers found that the terminated employees were not eligible for the benefits under the terms of the Westinghouse Plan, not by virtue of any amendment. Finally, CBS asserts that the PJS benefits at issue here are not benefits protected by § 1054(g) because they are not "early retirement benefits" since they are based on contingent events like lay-offs.

"With few exceptions, the 'anti-cutback' rule of [ERISA] prohibits any amendment of a pension plan that would reduce a participant's 'accrued benefit.'" C. Laborers Pension Fund v. Heinz, 541 U.S. 739, 741 (2004) (citing 29 U.S.C. § 1054(g)). Section 1054(g)(2) prohibits pension plan amendments that eliminate or reduce an "early retirement benefit" or a "retirement type subsidy" "with respect to a participant who satisfie[d] (either before or after the amendment) the preamendment conditions for the subsidy."

We agree with CBS that the terminated employees were not eligible for PJS benefits under the terms of the plan as there had been no qualifying event. To qualify for PJS benefits, employees had to be terminated by an "Employer." Only "[a]n Employee whose employment is terminated . . . as a result of a Permanent Job Separation" qualifies for PJS benefits. R3-47, Ex. C at 65. The Westinghouse Plan states that "in no event shall a Permanent Job Separation occur if an

10

Employee is offered continued employment by . . . a successor employer which is neither an Employer, Affiliated Entity, nor an Excluded Unit." Id. at 12. We agree with both the Westinghouse Administrative Managers interpretation and the district court's finding that Siemens was a "successor employer" that offered "continued employment" to the terminated employees. It then follows that the ending of the terminated employees' employment with CBS in August of 1998 was not a qualifying event because they had accepted an offer of "continued employment" with Siemens.

Moreover, there was no qualifying event for PJS benefits under the Westinghouse Plan in March of 1999, either. See Gritzer v. CBS, Inc., 275 F.3d 291, 297 (3d Cir. 2002) (determining that discharge by company not defined as "employer" is "fatal" to claim of PJS benefits by former CBS employee). Siemens, the company that terminated the employees here, does not qualify as an "Employer" under the express terms of the Westinghouse Plan that defines "Employer" as "Westinghouse Electric Corporation," now CBS. R3-47, Ex. C at 8 ("Employer means the Company"); id. at 4 ("Company means Westinghouse Electric Corporation"); see also Gritzer, 275 F.3d at 297 ("'Employer' simply means Westinghouse. . . . Ceramics, or any other successor company for that matter, does not qualify as an 'Employer' under the express terms of the Plan.").

11

Because the terminated employees had "continued employment" with and then were terminated by Siemens, a "successor employer," they do not qualify for PJS benefits from the Westinghouse Plan. Section 1054(g) "does not override conditions originally imposed by the [pension] [p]lan." Dade v. N. Am. Philips Corp., 68 F.3d 1558, 1562 (3d Cir. 1995).

It does not appear that the terminated employees contend, at least in their initial brief, that Siemens violated § 1054(g), but rather focus on arguing that CBS unlawfully amended its plan to eliminate PJS benefits. See Appellants' Br. at 9 (admitting that the "agreement between the two corporations excused Siemens of any obligation to continue the . . . PJS [benefits]"). To the extent the terminated employees do assert a § 1054(g) violation as to Siemens, such an argument fails, as it is undisputed that the Siemens plans only became effective 1 September 1998 and never provided PJS benefits that could conceivably be "cutback."

B. 29 U.S.C. § 1058

Section § 1058 provides that a plan may not "merge, consolidate with, or transfer its liabilities to any other plan . . . unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (if

12

the plan had then terminated)." The district court held that § 1058 was inapplicable because there had been no merger of assets of the Siemens and Westinghouse Plans.

The terminated employees argue that a merger of "assets" is not a necessary condition under § 1058, and here, a transfer of pension liabilities were passed on to the Westinghouse Plan. Specifically, they contend that § 1058 applies because CBS and Siemens' agreement and transactions constituted a transfer of liability of Siemens to the Westinghouse Plan. We agree, however, with CBS that § 1058 is inapplicable here, as no transfer of assets or liabilities occurred between the Westinghouse Plan and Siemen Plan. Siemens did not become a sponsor of the Westinghouse Plan when Westinghouse agreed to provide eligibility credit, vesting credit, and limited pension service credit under its pension plan to former employees who elected to work for Siemens in the 19 August 1998 to 31 August 2998 period. By providing the credits, the Westinghouse Plan alone created and provided for such liabilities. The two plans did not merge or transfer liabilities for the purposes of § 1058 through the mere fact that the Westinghouse Plan provided such credits to its plan participants.

## IV. CONCLUSION

The terminated employees have failed to articulate a basis for prevailing

13

against the defendants under 29 U.S.C. §§ 1054(g) and 1058.  Accordingly, we

**AFFIRM** the district court's entry of summary judgment as to CBS, the

Westinghouse Plan, Siemens, and the Siemens Plan.