**NEW JERSEY PAYPHONE ASSOCIATION, INC, a not for profit corporation organized under the laws of New Jersey,**

v.

**TOWN OF WEST NEW YORK, Appellant.**

**No. 01–1917.**

United States Court of Appeals, Third Circuit.

Argued: March 5, 2002.

Filed: July 26, 2002.

Joseph R. Mariniello, (argued), Mariniello & Mariniello, P.C., Fort Lee, N.J., for appellant.

Jeffrey A. Donner, (argued), Stryker Tams & Dill, LLP, Newark, N.J., for appellee.

BEFORE: ALITO, RENDELL, and HALL,[1] Circuit Judges.

HALL, Circuit Judge.

The Town of West New York appeals the District Court's grant of summary judgment finding an ordinance of the town preempted by Section 253 of the Telecommunications Act of 1996, codified at 47 U.S.C. § 253. The ordinance permits the town to grant an exclusive franchise to one or two pay telephone providers to provide telephone service on public rights of way. The franchise is to be awarded pursuant to a formal auction process and is to be based on several criteria, primarily the amount of compensation offered to the town by the bidder. The town denies that the ordinance has the effect of prohibiting pay telephone providers from providing pay telephone service in violation of 47 U.S.C. § 253(a). It also claims in the alternative that it falls within the Section 253(c) safe harbor protecting municipal regulation of public rights of way from the preemptive effect of Section 253(a). We affirm the ruling of the District Court.

The District Court had original subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. Although the appeal was not initially timely, the District Court granted an extension of time to file pursuant to Fed.R.App.P. 4(a)(5). That extension has not been appealed and this appeal is within the extended time period granted by the District Court.

1. The Honorable Cynthia Holcomb Hall, Circuit Judge for the Ninth Circuit, sitting by

## I.

This appeal concerns the lawfulness of an ordinance adopted on February 16, 2000 by the Town of West New York, New Jersey (the "Town") regulating the placement of pay telephones in public rights of way. Plaintiff–Appellee, the New Jersey Payphone Association (the "Payphone Association") is a not-for-profit organization whose members operate payphones in the Town. The Payphone Association challenged the Town's Ordinance 26/99 (the "Ordinance") on a number of grounds, alleging that it violates Section 253 of the Telecommunications Act of 1996 (the "TCA"), 47 U.S.C. § 253; New Jersey statutory law; and the United States and New Jersey Constitutions.

Citing the need to control the placement of pay telephones on public rights of way in order to ensure the safe passage of vehicular and pedestrian traffic and promote an aesthetically pleasing environment, the Ordinance requires prospective payphone operators to obtain a local permit for each pay telephone specifying its exact location. Historically, any service provider could obtain such a permit subject to payment of a small fee and satisfaction of certain minimum requirements as to the maintenance, location, and specifications of their payphones. In the current Ordinance, however, Section Three specifies:

The Town reserves the right to award a Contract for replacement or operation of [payphones] in the public right-of-way of the Town and on Town owned property. If the Town exercises such rights no other permits or renewals for the operation of [payphones] shall be issued and any previously installed [payphones]

designation.

shall be removed from the public right-of-way within thirty days.

J.A. at 74.

Pursuant to Section Three of the Ordinance, the town issued a document entitled "Franchise for Public Pay Telephones throughout the Town of West New York" (the "Franchise Notice"), inviting bids for contracts to provide payphones. J.A. at 76–111. The Franchise Notice informs bidders that the Town has been split into two zones for bidding purposes with a separate auction for each zone. Bidders are required to install between 75 and 100 payphones for each zone at locations to be determined by the Director of Public Safety in consultation with the successful bidder. The Franchise Notice also provides that the Town is to be compensated based on a percentage of revenue generated by the payphones. In addition, bidders must demonstrate the ability to provide a security deposit of $250 per proposed telephone, or at least $18,750.

The Franchise Notice also sets out the criteria used by the Town in evaluating bids. The Town is to evaluate bids based on a list of seven factors including: the experience of the applicant, the ability of the applicant to maintain the pay telephones, the efficiency of the public service to be provided, the willingness of the applicant to provide telephones in historically under-served residential areas lacking private telephones, the applicant's history of maintaining payphones within the Town, and the cost of calls to the public. Also on the list of evaluation criteria is the amount of compensation offered to the Town by the applicant. The purchasing agent for the Town forthrightly testified by affidavit that he considered compensation to the Town to be the most important factor in evaluating bids. J.A. at 138–139.

As it happened, the initial attempt to auction service for the two zones ended without any awards. Three companies submitted proposals. The purchasing agent testified that the three bids were largely equivalent except for the compensation offered to the Town and the per-call cost to the public. He determined that differences in billing methods between the bidding companies in light of inadequate bid specifications on the treatment of long distance service created difficulties in evaluating the bids. Accordingly, he recommended that all bids be rejected and the specifications redrawn in order to conduct the auction anew. After initiation of this suit, the parties agreed to take no further action pending determination of the lawfulness of the Ordinance and Franchise Notice.

█ The District Court issued an opinion granting summary judgment for the Payphone Association and denying the Town's cross-motion for summary judgment on the basis that Section Three of the Ordinance was preempted by 47 U.S.C. § 253. *New Jersey Payphone v. Town of West New York*, 130 F.Supp.2d 631 (D.N.J. 2001). It specifically found the grant of an exclusive franchise preempted by Section 253 and separately found the selection criteria used in awarding such franchises also violated this section. In addition to granting summary judgment, the District Court permanently enjoined the Town from enforcing Section Three of the Ordinance and the Franchise Notice, including making any award of an exclusive franchise for providing pay telephone service in the Town based on the amount of compensation paid. Because the District Court found that federal preemption fully resolved the dispute, it declined to reach alternative constitutional and state law claims raised by the Payphone Association. Preemption of Section Three of the Ordinance and the Franchise Notice by Section

253 of the TCA is correspondingly the sole issue raised on appeal.[2]

## II.

### A. Background Considerations

■ Section 253 of Title 47 of the United States Code provides in relevant part:

(a) *In general*

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) *State regulatory authority*

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) *State and local government authority*

2. Despite this fact, the concurrence would ground affirming the District Court in state rather than federal law on the basis of the jurisprudential principle that federal courts should generally not pass on constitutional questions when non-constitutional grounds will dispose of a dispute. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 345, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (J. Brandeis, concurring). While we certainly recognize the importance of this canon, we disagree with its application in this case.

We have in the past noted that federal preemption is generally an issue requiring the determination of congressional intent rather than resolving a constitutional problem of substance. *See United Services Auto. Assoc. v. Muir,* 792 F.2d 356, 363 (3d Cir.1986). While Judge Alito, following the Fourth Circuit's approach in *Bell Atlantic Maryland Inc. v. Prince George's County,* 212 F.3d 863 (4th Cir.2000), cites Supreme Court dicta labeling whether state and federal laws conflict a "constitutional question," *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981), the Supreme Court, which has itself on occasion considered preemption issues despite the presence of unresolved and potentially dispositive state law issues, *see Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991), has also acknowledged that, "[t]he basic question involved in [preemption claims under the Supremacy Clause] is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift & Co. v. Wickham,* 382 U.S. 111, 120, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); *see also Morales v. Trans World Airlines, Inc.* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) ("[t]he question, at bottom, is one of statutory intent"). For this reason, preemption questions are "treated as 'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications." *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 272, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). This is particularly appropriate where preemption is of the express statutory variety and Congress' power to provide for such preemption is not in question.

Moreover, the concurrence itself recognizes that concerns about separation of powers, finality, and the paramount significance of constitutional adjudication are not substantially implicated in this case. While principles of federalism and comity are to some extent implicated, we are not convinced that they are better served by ruling on a state law issue intimately concerned with local budgeting and the apportionment of powers between state and local governments than by interpreting a federal statute that was expressly intended by Congress to preempt certain types of local ordinances touching on issues within its power to regulate. *See Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 28, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (citing *Chicago v. Fieldcrest Dairies, Inc.,* 316 U.S. 168, 171, 62 S.Ct. 986, 86 L.Ed. 1355 (1942)). Therefore, we see no reason to address the state law issues, which have not been extensively briefed, in preference to the TCA claim that is the focus of this appeal.

Nothing in this section affects the authority of a State or local government to manage the public rights of way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights of way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) *Preemption*

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

Subpart (a) expressly preempts any state or local law inconsistent with its prohibition. As indicated by their opening text, subparts (b) and (c) are structurally savings clauses, excepting the listed local and state functions from the preemptive effect of subpart (a). *Cablevision of Boston Inc. v. Public Improvement Comm'n*, 184 F.3d 88, 98 (1st Cir.1999). At the same time, the division between (b) and (c) defines the boundaries of each body's retained regulatory authority, with states permitted to regulate broadly with respect to public safety and other issues, and local governments limited to powers delegated by their states and management of their rights of way. *In re TCI Cablevision*, 12 F.C.C.R. 21396, ¶ 102–104, 109 (Sept. 19, 1997). In the case of a dispute over a local regulation of rights of way, once the party seeking preemption sustains its burden of showing that a local municipality has violated Section 253(a) by formally or effectively prohibiting entry into the payphone market, the burden of proving that the regulation comes within the safe harbor in Section 253(c) falls on the defendant municipality. *In re Petition of the State of Minnesota*, 14 F.C.C.R. 21697, n. 26 (1999).

This much is clear: Section 253 is quite inartfully drafted and has created a fair amount of confusion. For this reason, we briefly clear out some legal underbrush before getting to the main issue.

In applying Section 253, one question with which courts have struggled is whether there is a private right of action to challenge ordinances as preempted by the section directly in federal court. This issue is made confusing by the structure of the section and the language of Section 253(d). To begin with, it is not clear from the text and placement of subsection (d) whether Congress intended preemption by the Federal Communications Commission (the "FCC") to be the sole means of enforcing Sections 253(a) and (b), or, if a private cause of action exists to enforce either of these subsections. *See Cablevision of Boston*, 184 F.3d at 98. In the former case, (d)'s omission of (c) could be read to mean that a private right of action addressed directly to a federal court, instead of FCC jurisdiction, is available solely to challenge local legislation purporting to regulate rights of way and thereby potentially implicating Section 253(c).[3] This was the conclusion reached by the Sixth and Eleventh Circuits, which, based primarily on legislative history, found that it was the intent of Congress to allow municipalities to defend themselves against preemption suits locally rather than travel to

---

**3.** The tension in this reading is that subsection (c) can not be "violated" or separately

enforced if it is merely a safe harbor.

Washington D.C. to be heard before the FCC. *TCG Detroit v. City of Dearborn,* 206 F.3d 618, 623 (6th Cir.2000); *Bell-South Telecommunications, Inc. v. Town of Palm Beach,* 252 F.3d 1169, 1189–91 (11th Cir.2001); *see also* 141 Cong.Rec. S8305–02 (June 14, 1995) (final text of § 253(d) designed to leave rights-of-way issues to local federal courts and allow the FCC to preempt "core" issues only.)

While the opinion of the Eleventh Circuit in particular is well reasoned, we need not decide whether to adopt it at this time because resolution of this issue is not before us. In ruling on summary judgment, the District Court found that there is a private right of action implied in Section 253. 130 F.Supp.2d at 636. That ruling has not been challenged on appeal. Therefore, for the purpose of this case only, we assume that there is a private federal court remedy for local rights-of-way ordinances that are preempted by the TCA. The Supreme Court has held that whether a federal statute creates a private claim for relief is not a jurisdictional question. *Northwest Airlines, Inc. v. County of Kent, Michigan,* 510 U.S. 355, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994) (adjudicating the claims raised by a private plaintiff on certiorari while assuming a private right of action under the federal Anti–Head Tax Act). Consequently, we are not required to address the private right of action issue when it has not been raised by the parties.

A second question with which courts have struggled is the scope of preemption consistent with Section 253(c). Confusion again arises because of inconsistencies within the structure of the statute. Although Sections 253(b) and (c) are framed as savings clauses, Section 253(d) speaks of "violation" of (b) suggesting that it must impose some sort of substantive limitation independent of (a). This also raises the possibility that Section 253(c), which is similarly phrased, contains a parallel limitation. The legislative history of the TCA also gives some suggestion that Congress, in enacting Section 253(c), may have intended to create a separate enforceable requirement that municipal acts be "competitively neutral and nondiscriminatory." *See* 141 Cong.Rec. H8460–01 (Aug. 4, 1995) (debate on current language which was adopted to allow localities to retain authority to set own fees so long as they were competitively neutral).

While there is a circuit split on this issue,[4] the facts of the present case are such that there is again no need to resolve it for the Third Circuit at this time. As discussed below, the operation of Section 253(a) is sufficient to preempt the Ordinance in this case and it does not fall within the Section 253(c) safe harbor. We therefore limit our ruling to preemption under Section 253(a).

**B. Exclusivity**

▮▮▮ The Supremacy clause of the United States Constitution invalidates state laws that "interfere with or are contrary to" federal law. *Gibbons v. Ogden,* 9

---

4. The Sixth Circuit and a number of district courts have found that Subsection (c) contains a separate limitation raising a cause of action. *See TCG Detroit,* 206 F.3d 618, 623–24 (6th Cir.2000), *Bell Atlantic–Md., Inc. v. Prince George's County, Md.,* 49 F.Supp.2d 805, 814 (D.Md.1999) (rev'd on other grounds, 212 F.3d 863 (4th Cir.2000)); *AT & T Communications of the Southwest, Inc. v. City of Dallas,* 8 F.Supp.2d 582, 591 (N.D.Tex.1998). The Eleventh Circuit has found that subsection (a) contains the only substantive limitation. *Town of Palm Beach,* 252 F.3d at 1169 1187–88. *See also TCG New York Inc. v. City of White Plains, N.Y.,* 125 F.Supp.2d 81, 87 (S.D.N.Y.2000). The First Circuit, while discussing the issue, has not resolved it. *Cablevision of Boston,* 184 F.3d at 98–100.

Wheat. 1, 22 U.S. 1, 211, 6 L.Ed. 23 (1824). When acting on subjects within its constitutional power, Congress is empowered to preempt state law in several ways, including by expressly stating its intention to do so. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). In this case, Section 253 expressly preempts state or local statutes, regulations, or other requirements that prohibit or have the effect of prohibiting market entry. 47 U.S.C. § 253(a).

In deciding whether the District Court correctly granted summary judgment to the Payphone Association on the issue of preemption, we review its legal determinations *de novo*. *Gritzer v. CBS Inc.*, 275 F.3d 291, 296 (3d Cir.2002). We begin, as did the District Court, with the exclusive nature of the franchises that Section Three of the Ordinance and the Franchise Notice would create. We find that the exclusivity of the franchises that the Town would grant violates Section 253(a). There can be no question that designating a single company as authorized to provide payphones in the public rights of way in a large geographical area which currently is served by multiple companies, and which is capable of accommodating at least 75–100 separate telephones, reduces competition and constitutes a barrier to entry. The deliberate creation of scarcity by the Town in this case is directly at odds with the letter and spirit of the TCA. The District Court correctly noted that, "it is well-recognized that the [TCA] marked a sea change in the regulation of the telephone industry in which Congress rejected the long-held premise that monopolies were necessary to reliable and universal service." 130 F.Supp.2d at 636 (quoting *Cablevision*, 184 F.3d at 97). Because Section Three of the Ordinance would act to recreate just such monopolies, it is preempted. *See also* 47 U.S.C. § 276 (directing the FCC to establish rules to promote competition among payphone service providers.)

The Town nevertheless protests that the Ordinance is not preempted because the auction process it wishes to use is itself competitive. It also argues that the Ordinance does not create a substantial burden on competition because other providers may still compete to place pay telephones on private property near to the public rights of way. We find both of these arguments unconvincing. A bidding competition where the winner is determined by willingness to share a monopoly profit with the Town is clearly not the kind of competition intended by the TCA. Even if an exclusive franchise were awarded solely on the basis of the nominal cost of services to the consumer, an auction run under such a rule would still be a highly imperfect substitute for actual market competition. In either case, the effect of such an ordinance is still to prohibit losing entities as a matter of law from competing for private customers, a violation of the plain language of Section 253(a).

As to placing pay telephones on private property, the Town provides no evidence for the inherently implausible proposition that such installations would allow other providers to fully compete for the patronage of people requiring use of a payphone while travelling or otherwise located in public places. In economic parlance, payphones on private property would, for various reasons such as the inconvenience of travelling to such phones or their lack of visibility from the rights of way, be imperfect substitutes for phones actually in the rights of way. The availability of competition from such locations thus does not save the Ordinance from the prohibitions of Section 253(a).

The Town also claims that Section Three of the Ordinance is protected by Section

253(c). It claims that the Ordinance is within the safe harbor because its purpose is to ensure the orderly flow of traffic unimpeded by the random placement of public payphones in unsafe locations as well as to prevent such telephones from becoming the focal points of various criminal activities and ensure that they are adequately maintained. It thus claims that it is properly an exercise of its reserved power to manage the public rights of way.

While we are extremely skeptical about the proposition that managing traffic patterns and crime requires an exclusive franchise, we do not deny that there may be a rational relationship between the two. The purchasing agent's candid admission that the amount of compensation offered to the Town was the primary criterion in selecting the winning bid certainly suggests that preserving the safety of the rights of way was not the real or primary purpose of the Ordinance. It has obvious use as a tool for revenue generation and regulation of the telecommunications services provided to the public. However, it is at least plausible that the Ordinance could ease the burden of policing the rights of way by limiting the number of providers of payphones that the Town would be required to monitor to one. Under conditions of limited resources, such a reduction in the cost of monitoring could possibly have a material bearing on the Town's ability to police the placement and maintenance of payphones.[5] Thus, although other courts have been willing to strike down local legal requirements that

are only tenuously linked to rights-of-way management, *see City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1178–79 (9th Cir. 2001), (financial reporting requirements and regulations on ownership related to fitness and stability of service providers struck down as "more than necessary" to manage rights of way and on the basis that permitting them on such a tenuous connection would leave no limiting principle on § 253(c)); *City of White Plains*, 125 F.Supp.2d at 1309 (reporting and inspection requirements are outside the scope of "reasonable" regulations of the rights of way), or that merely act as conditions on access to rights of way as a "hook" to achieve other regulatory purposes, *see BellSouth Telecommunications v. City of Coral Springs*, 42 F.Supp.2d 1304, 1309 (S.D.Fla.1999) *rev'd in part on other grounds (excluding reporting requirements, financial, technical and legal qualifications); Town Of Palm Beach*, 127 F.Supp.2d at 1355, we will assume that the Ordinance qualifies as "manage[ment of] the public rights of way" for the purposes of Section 253(c).

However, this does not end the inquiry as the scope of the Section 253(c) safe harbor is limited by its use of the terms "competitively neutral" and "nondiscriminatory." The use of these terms in the section is not immediately obvious but rather poses something of an interpretive challenge of its own. The FCC reads them as straightforward limits on both the power to manage the rights of ways reserved for local governments in general and their freedom to impose fees for use of

---

**5.** We hasten to note that the facts presented by the Town do not demonstrate an inability to police the rights of way under current conditions. Indeed, an affidavit provided by the Deputy Director of the Town's police force certified that the Town had previously suffered from a proliferation of unlicensed payphones, but indicated that efforts to cur-

tail the problem through traditional methods had met with a substantial measure of success. (J.A. at 132–136, certification of Joseph Pelligio). Nevertheless, the Ordinance is rationally related to management of the public rights of way in that it may reduce the cost of such policing.

the rights of way. *See In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082 ¶ 39; *TCI Cablevision,* 12 F.C.C.R. 21,396, ¶ 108; *In re State of Minnesota,* 14 F.C.C.R. 21697 ¶ 61. The majority of courts that have ruled on this issue have also followed the lead of the FCC without comment. *See City of Dallas,* 8 F.Supp.2d at 593; *TCG Detroit v. City of Dearborn,* 977 F.Supp. 836, 840–41 (E.D.Mich.1997) *aff'd* 206 F.3d 618 (6th Cir.2000). The First Circuit, however, has questioned this reading, reasoning that as a matter of syntax, the phrase "on a competitively neutral and nondiscriminatory basis" as it appears in the middle of Section 253(c) can only modify the phrase "to require fair and reasonable compensation" immediately preceding it in the text and not "to manage the public rights of way." *Cablevision of Boston* 184 F.3d at 100–101. On its reading, the phrase "for use of public rights-of-way" following "on a competitively neutral and nondiscriminatory basis" must as a matter of logic modify "compensation," thereby trapping "on a competitively neutral and nondiscriminatory basis" on the same grammatical level as itself. In other words, the First Circuit reasons that the relevant phrase is followed by text making it part of a subordinate clause that only makes sense as a condition on compensation requirements.[6]

Our own appraisal of the text of Section 253(c) read in isolation is that the function of "on a competitively neutral and nondiscriminatory basis" is ambiguous. While the reading of the First Circuit is most consistent with the syntax to which it points, it is also possible to read the relevant phrase as limiting both the power to manage the rights of way in general and to demand compensation. Although such a reading is awkward, it is, unfortunately, not significantly more so than the available alternatives because Section 253(c) is simply not well drafted. It is, rather, written in such a way as to make problems of syntax unavoidable regardless of the reading.

For example, immediately following the language already cited above, Section 253(c) uses the phrase "for use of public rights of way on an nondiscriminatory basis." A natural reading of that phrase might suggest that it means that telecommunications providers must use the public rights of way in a non-discriminatory manner. However, such a reading—odd on it own terms—is nonsensical in context, because this phrase is located in a safe harbor that preserves powers for state and local governments and does not deal with regulation of service providers themselves. This second use of the term "nondiscriminatory" may therefore be meant to signify that compensation requirements and perhaps general rights-of-way management are to be nondiscriminatory. But if so, the term is at least partially duplicative of the same term used in the previous phrase. We are thus forced to choose between illogical uses of the term "nondiscriminatory."

In trying to ferret out the intention of Congress, we therefore conclude that it would not be proper to place too much interpretive weight on the niceties of the syntax of Section 253(c), given the incon-

---

6. Nevertheless, without deciding the issue, the First Circuit also noted that an examination of the context of a statutory section can sometimes lead courts to decide "that a linguistically implausible interpretation best reflects the legislature's intent." *Id.* at 101. It reasoned that Congress likely intended "on a competitively neutral and nondiscriminatory basis" to apply to Section 253(c) as a whole, since both management of rights of way and compensation schemes could equally interfere with the TCA's goal of open competition among telecommunication providers. *Id.*

sistencies of the section as a whole. The most that we can safely conclude looking at the text of this section in isolation is that there are multiple readings possible, several of which require rights-of-way management to be at least nondiscriminatory and others of which require it to be both nondiscriminatory and competitively neutral.

■ However, in looking for the meaning of this statutory language, we must look to the statutory context in which that language is used and the broader context of the statute as a whole as well as the language itself. *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991); *Rosenberg v. XM Ventures*, 274 F.3d 137, 141–42 (3d. Cir.2001). In this instance, the statutory framework indicates that Congress intended permissible management of the rights of way to be limited to those local statutes or regulations that are nondiscriminatory and competitively neutral. A reading of Section 253(c) placing no limit on management of public rights of way outside of compensation requirements would be demonstrably at odds with the Congressional intent expressed in Section 253(a) to foster competition. We can find no reasonable basis in light of the overarching scheme of the TCA to conclude that Congress intended to reserve for the states and localities the power to discriminate against certain telecommunications service providers in regulating rights of way while otherwise generally preempting local laws burdening market entry. Rather, a more reasonable reading of the section in context is that Congress simply intended to preserve local power to regulate the public rights of way for purposes unrelated to the competition to provide telecommunications services to the public and in a manner consistent with that competition.

Further evidence that the contrary could not have been Congress' intent is found in Section 253(b). This section, which is largely parallel to Section 253(c), includes the *general* requirement that state regulation be "on a competitively neutral basis," indicating that Congress understood quite well that a broader carve-out of state authority would permit states to use the areas in which their regulatory authority was preserved to undermine the competitive framework established by the TCA as a whole. In this context, it would make no sense for regulation of the rights of ways, access to which is critical to the ability of service providers to reach potential customers, to be exempted from a requirement that is otherwise generally applied to state law protecting public safety and welfare. Section 253(b) demonstrates the balance Congress chose as necessary to effectuate its intent to enhance competition and eliminate local monopolies while leaving room for reasonable regulation of issues of particular state and local concern.

■ Thus, in looking at the statutory language in context, we find that the more logical reading of Section 253(c) requires management of public rights of way to be competitively neutral and nondiscriminatory. Nevertheless, since Section 253(c) is facially ambiguous, we also look to the legislative history. While most of the Congressional discussion of Section 253 was on subjects tangential to those of concern here, *see e.g.*, 141 Cong.Rec. H8460–01 (August 4, 1995) (statements by Congressmen Stupak and Barton),[7] such commen-

---

**7.** Section 253(c) began life as the Stupak-Barton amendment in the House of Representatives (identical language was inserted into the Senate version of the TCA in committee

tary as is available touching on this issue support this reading. For example, the report of the conference committee reconciling the House and Senate versions of the TCA notes "the authority of a local government·to manage its public rights-of-way in a nondiscriminatory and competitively neutral manner" in several places. S.Rep. 104–230, *178, *179, *180 (February 1, 1996). During floor debate of an amendment brought by Senator Feinstein to eliminate a prior version of Section 253(d) giving the FCC authority to ·preempt municipal rights-of-way regulations, Senator Hollings described the history of the section as follows:

> Section [253] is the removal of the barriers to entry, and that is exactly the intent of the Congress.... What we are trying to do is say, now, let the games begin, and we do not want the States and the local folks prohibiting or having any effect of prohibiting the ability of any entity to enter interstate or intrastate telecommunications services. When we provided that, the States necessarily came and said ... we have the responsibilities over the public safety and welfare....
>
> So what about that? ... So we said, well, right to the point: "Nothing in this section shall affect the ability of a State to impose on a competitively neutral basis"—those are the key words there....
>
> The mayors came ... and they said we have our rights of way and we have to control—and every mayor must control the rights of way. So then we wrote in there: Nothing shall affect the

authority of a local government to manage the public rights of way or to acquire fair and reasonable compensation on a competitively neutral and nondiscriminatory basis.

> "Competitively neutral and nondiscriminatory basis." Then we said finally, indeed, if they do not do it on a competitively neutral or nondiscriminatory basis, we want the FCC to come in there in an injunction.

141 Cong.Rec. S8134–01, *S8174 (June 12, 1995). Similarly, one of the authors of Section 253(c) noted that it "does not let the city governments prohibit entry of telecommunications service providers for pass through or for providing service to their community." 141 Cong.Rec. H460–01, *8460 (August 4, 1995) (statement of Congressman Barton). Finally, those statements on the floor of the House of Representatives that touched on the issue during debate on the Conference Report to accompany the TCA also reflected the understanding that municipalities were to be limited to nondiscriminatory and competitively neutral rights of way management. 142 Cong.Rec. H1145, *H1150, *H1173 (February 1, 1996) (statements of Congressman Goss and Congresswoman Pelosi).

Though somewhat cursory, this evidence of legislative intent supports the reading of Section 253(c) adopted by the FCC and other jurisdictions. In combination with this legislative history, the context provided by the other parts of Section 253 and the structure of the statute as a whole persuades us that the "competitively neu-

by Senator Hutchison). The amendment was written to replace Representative Dan Schaefer's "parity provision" which would have required that any fees imposed upon a telecommunications provider for use of the public rights of way would have to have been exactly equal regardless of the extent to which any particular provider would impose upon

local resources or other users of the rights of way. *See* 141 Cong.Rec. H8427 (August 4, 1995). The authors' comments accompanying the introduction of their amendment were primarily concerned with providing local governments with the flexibility to vary charges based on the use of the rights of way.

tral and nondiscriminatory" requirement applies to management of the rights of way as well as compensation.

■ In deciding whether the Ordinance is protected under Section 253(c) we must thus determine whether it is competitively neutral and nondiscriminatory. We find that it is not. The Ordinance is facially discriminatory in that it permits the Town to choose one service provider allowed to provide pay telephone service to the public to the exclusion of all others based on criteria determined by it rather than the market. The Town may, of course, make distinctions that result in the *de facto* application of different rules to different service providers so long as the distinctions are based on valid considerations. It can, for example, have different policies for companies wishing to dig up the streets in order to lay new conduit, from those who wish to convert existing conduit and do not need to dig up the streets. What it cannot do is what it has tried to do: create a set of rules the purpose of which is to select one company over others for preferential treatment.

The attempt to create zones of exclusive franchise also fails the test of competitive neutrality. Bidders are required according to Section Three and the Franchise Notice to compete for service of two zones requiring a minimum of 75–100 payphones. As an integral part of that requirement they must demonstrate the ability to service such zones and are also required to pay a deposit tied to the number of payphones they will install. The Ordinance thus favors larger companies with the resources to service the zones as defined by the Town. The Town cannot, consistent with the requirement to be competitively neutral, force companies into a competition the terms of which favor larger telecommunications companies with the resources to meet such demands over smaller competitors who may not have similar resources.

Because Section Three of the Ordinance sets up an exclusive franchise that is inherently discriminatory and creates competitive inequalities, it is not protected by Section 253(c).

## C. Selection Criteria

In addition to the creation of an exclusive franchise itself, the District Court also evaluated the selection criteria specified in the Franchise Notice for their consistency with Section 253. However, such an evaluation is not necessary in this case, since we have already found that the attempt to set up an exclusive franchise is itself preempted by Section 253(a) and not saved by Section 253(c). We therefore decline to rule separately on whether the use of such criteria would be permissible. We do note, however, that several of the criteria which the Town would apply have been rejected in connection with non-exclusive franchise schemes considered by other jurisdictions. *See City of Auburn,* 260 F.3d at 1178; *City of White Plains,* 125 F.Supp.2d at 91–93; *City of Dallas,* 8 F.Supp.2d at 592–94; *City of Coral Springs,* 42 F.Supp.2d at 1310.

## CONCLUSION

For the foregoing reasons, the District Court's Order Granting the Payphone Association's Motion for Summary Judgment and denying the Town's Cross–Motion for Summary Judgment is AFFIRMED.

ALITO, Circuit Judge, concurring in the judgment.

This case involves a challenge under federal and state law to a local ordinance regulating the use of public rights-of-way by payphone service providers. The majority bases its decision on federal law,

holding that the ordinance is invalid because it is preempted by the Federal Telecommunications Act of 1996. While I agree that the ordinance in question is invalid, I arrive at this conclusion for different reasons.

It is well established that, when possible, federal courts should generally base their decisions on non-constitutional rather than constitutional grounds. *See Harmon v. Brucker*, 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' nonconstitutional claim that respondent acted in excess of powers granted him by Congress."); *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."); *United States v. Serafini*, 167 F.3d 812, 815 n. 7 (3d Cir. 1999) ("Longstanding practice calls for federal judges to explore all non-constitutional grounds of decision before addressing constitutional ones." (quoting *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir.1998))). Indeed, reaching constitutional issues in advance of non-constitutional ones may be reversible error. *See, e.g., Crane v. Indiana High School Athletic Association*, 975 F.2d 1315, 1319 (7th Cir. 1992) (citing *Schmidt v. Oakland Unified School District*, 457 U.S. 594, 595, 102 S.Ct. 2612, 73 L.Ed.2d 245 (1982)); *WJW–TV, Inc. v. City of Cleveland*, 878 F.2d 906, 910 n. 4 (6th Cir.1989); *Beeson v. Hudson*, 630 F.2d 622, 627 (8th Cir.1980).

In *Bell Atlantic–Maryland, Inc. v. Prince George's County, Maryland*, 49 F.Supp.2d 805 (D.Md.1999), a case very similar to the one now before us, the district court held that the Federal Telecommunications Act preempted a local ordinance that regulated the use of county-owned rights-of-way by telecommunications companies doing business in the county. The district court did not address the state-law issues raised. On appeal, the Fourth Circuit held that the district court had committed reversible error by deciding the constitutional question of preemption before considering the state-law questions upon which the case might have been decided. *See Bell Atlantic Maryland, Inc. v. Prince George's County, Maryland*, 212 F.3d 863 (4th Cir.2000). The Fourth Circuit reasoned as follows: (1) courts should avoid deciding constitutional questions unless they are essential to the disposition of a case; (2) determining whether a federal statute preempts a state statute is a constitutional question implicating the Supremacy Clause; (3) disposition of the state-law questions raised by Bell Atlantic could have disposed of the case; (4) therefore, the district court committed reversible error by deciding the constitutional question of preemption before considering the state-law questions. *See id.* at 865–66. The Fourth Circuit reiterated this reasoning in *MediaOne Group, Inc. v. County of Henrico, Virginia*, 257 F.3d 356 (4th Cir. 2001), and the Eleventh Circuit took a similar approach in *BellSouth Telecommunications, Inc. v. Town of Palm Beach*, 252 F.3d 1169 (11th Cir.2001).

The majority opinion addresses the preemption question first and does not reach the state-law arguments. The District Court acknowledged the Fourth Circuit decision in *Bell Atlantic–Maryland*, but disagreed with its approach. *New Jersey Payphone Association Inc. v. Town of West New York*, 130 F.Supp.2d 631, 634 (D.N.J.2001). The District Court reasoned that it was appropriate to address the preemption issue first because preemption is a constitutional issue only in the indirect

sense that the authority for preemption rests on the Supremacy Clause. *See id.* at 634–35.

It is clear, however, that preemption is a constitutional issue. *See Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) ("[Determining whether a statute is preempted by federal law] 'is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict.' ") (quoting *Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971)).

The rationales behind the doctrine of avoiding constitutional questions except as a last resort are grounded in fundamental constitutional principles—the "great gravity and delicacy" of judicial review, separation of powers, the paramount importance of constitutional adjudication, the case or controversy requirement, and principles of federalism. *See Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 571, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); *Ashwander*, 297 U.S. at 345–46, 56 S.Ct. 466 (Brandeis, J., concurring). In this case, two factors mitigate the applicability of these principles: (1) we are striking down a local ordinance, not a federal law, and (2) the basis for doing so is preemption by federal statute, not direct violation of the federal Constitution. The former factor reduces the significance of concerns about separation of powers and the finality of judicial review because we are not invalidating an act of Congress, and our interpretation of the statutes at issue does not foreclose a response by the state or federal legislature. The latter factor diminishes the relevance of the paramount importance of constitutional adjudication as it applies to this case because we are not engaging in constitutional interpretation or declaring constitutional rights.

Nevertheless, the limitation on Article III courts to adjudication of actual cases or controversies counsels us to dispose of cases on the narrowest possible ground, which in this case is the state-law ground. Indeed, this seems to be the basis for Justice Brandeis's prudential rules regarding constitutional adjudication as set forth in his *Ashwander* concurrence. 297 U.S. at 345–47, 56 S.Ct. 466 (Brandeis, J., concurring). Moreover, the federalism rationale is pertinent here because we have the option of avoiding invocation of federal supremacy over local laws. Therefore, resolving this case on state-law grounds does less violence to principles of federalism and dual sovereignty. In sum, the principles underlying the prudential rules set forth in *Ashwander* are sufficiently applicable here as to counsel that we begin our analysis of this case with the state-law claim.

On the state-law claim, it is clear that the Ordinance violates N.J.Stat § 54:30–124(a), which prohibits a municipality from imposing any fees or assessments "in the nature of a local franchise" against telecommunication companies. It is well established in New Jersey law that a municipality may not raise revenue beyond what is required to meet regulatory expenses. *See, e.g., Taxi's Inc. v. Borough of East Rutherford*, 149 N.J.Super. 294, 373 A.2d 717, 723 (1977) ("A municipality may not, under the enabling legislation, pass a valid ordinance for revenue purposes only, but it may exact a fee commensurate with the cost of regulation and even in excess thereof if within reasonable limits." (citations omitted)). West New York offers no contrary arguments on the state-law issues. Indeed, the only argument that could conceivably be made by the Town in support of the Ordinance is that its revenue-raising

is "within reasonable limits." *See, e.g., Gilbert v. Town of Irvington,* 20 N.J. 432, 120 A.2d 114, 117 (1956) (holding that a municipality lacks general revenue-raising power, but that it may collect license fees "which may, at least within reasonable limits, exceed the regulatory costs"). This is not a plausible claim in this case, however, because the fees in the Ordinance are tied explicitly to the revenue generated by the payphone service provider. That is, the municipality will earn a proportion of the profits, and therefore, the fee scheme cannot honestly be considered to be an attempt to defray regulatory expenses. Thus, the Ordinance is in violation of N.J.Stat § 54:30–124(a).

Accordingly, I concur in the judgment, but for reasons grounded in state law rather than federal law.